Anthony D. DUKE, Plaintiff-Appellant,

v.

Joel HOCH et al., Defendants,

Home Indemnity Company, Garnishee-Appellee.

No. 71–2223.

United States Court of Appeals,
Fifth Circuit.

Oct. 5, 1972.

Rehearing Denied Nov. 14, 1972.

Motion Denied Feb. 20, 1973.

Marvin H. Gillman, Miami, Fla., for plaintiff-appellant.

William M. Hoeveler, Miami, Fla., for garnishee-appellee.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This appeal is by a judgment creditor who attempted unsuccessfully to reach by garnishment suit the proceeds of liability insurance policies insuring the judgment debtors. The judgment sought to be satisfied by garnishment had been rendered in a suit in which the insurer furnished a defense to its insureds, and in which the plaintiff claimed both damages covered by the policy and damages not covered. The key issue is this: in such a situation, in the merits trial, to what extent was counsel supplied by the insurer obligated to make available to the insured-defendant a verdict designating the respective portions of the total damages representing covered and noncovered damages, if in a subsequent suit on the policy by the judgment creditor it would be necessary that the creditor prove the amount of covered damages included in the verdict? In this case the verdict in the merits trial was a general verdict for a single sum and included covered and noncovered damages. In the garnishment suit the judgment creditor was required to prove the extent to which the verdict consisted of covered damages, and, being unable to do so, judgment was entered for the insurer. We reverse and remand.

Duke obtained a judgment for $226,266 in the United States District

Court for the Southern District of Florida on a jury verdict against Joel Hoch, David Shriber, and Samuel Frey, individually and as partners d/b/a Hoch, Shriber & Frey, Certified Public Accountants, for damages incurred through their rendering of various services to him. Duke then brought the present suit in the same court on diversity grounds to garnish an accountants' professional liability policy or policies issued by The Home Indemnity Company and insuring the judgment debtors against negligence in the performance of professional services but not intentional misconduct. After answer to the writ of garnishment and traverse to the answer, the garnishment cause was tried without a jury before the same district judge who had presided at the trial of the main case. At the conclusion of the garnishor's evidence, the court rendered a verdict for Home. To avoid the necessity for a remand in the event he was reversed, the judge then heard the garnishee's evidence and disposed of issues concerning notice and extent of policy coverage by orally stating findings of fact and conclusions of law. He entered, in accordance with his original verdict, a judgment that garnishor take nothing and the cause be dismissed. Duke appeals.

The complaint in the main suit against the accountants alleged that Duke had employed them to manage his financial and business affairs, such as preparing proper records and statements and rendering business advice. It charged that during their employ defendants failed to file timely and properly prepared income tax returns, causing him to be subject to interest and penalties imposed by the IRS; failed to discover or to advise Duke of "churning" in his account with a securities firm or to compel that firm to cease unauthorized purchases and sales; and failed to maintain proper books and records reflecting plaintiff's financial state of affairs, all of which caused him damages in the range of hundreds of thousands of dollars. Additionally the complaint stated that Shriber, the partner designated by the firm to supervise Duke's affairs, had opened a checking account known as "David Shriber Trust Account" in which Shriber commingled the funds of Duke and others without maintaining adequate records or rendering any accounting and from which Shriber withdrew for his personal use $40,000 of Duke's funds, which defalcation was not discovered in any audit by the firm or reflected in financial statements prepared for Duke. This latter aspect of the complaint, referred to throughout the proceedings as the "trust account count" (more properly, "trust account claim"), is central to the parties' contentions in this appeal. Finally, Shriber was said to have caused large losses by guaranteeing in Duke's name various obligations of a corporation and investing Duke's money in that corporation.

The defense of Hoch and Frey, individually and as members of the partnership, was undertaken by an attorney retained for them by Home, and by various members of a firm which Hoch and Frey retained as their personal counsel. Shortly after appearing in the case, counsel supplied by Home orally notified defendants' separate counsel that the insurer was defending under a reservation of rights, including the right to deny coverage. The notice was later confirmed in writing, but no written agreement was signed by or on behalf of the defendants. The record does not reflect any objection by the partners' personal attorneys.

At the trial of the main case, the District Judge directed a verdict for Duke on the trust account claim. He charged the jury on the remaining claims and instructed it to include the amount of damages, if any, resulting from the trust account liability in whatever total it might find for the plaintiff. No one requested a general verdict with answers to interrogatories, which would have served to segregate damages and to pinpoint the extent of liability for each of the claims. The jury returned an unap-

portioned verdict in favor of Duke for $226,266, and judgment was entered accordingly. The garnishment proceeding ensued.

## I. Availability to the insureds of an allocated verdict

At the garnishment proceeding, the District Judge first considered whether the unallocated verdict represented in part liability for noncovered acts. Obviously, the troublesome problem of separating out of the unallocated verdict the precise damages for which Home was responsible would be reached only if it was first established that a portion of the verdict represented liability for noncovered acts.

 In its defense of the garnishment suit the burden was upon Home to establish that the judgment entered against its insureds and sought to be collected included damages for noncovered acts. See Jewelers Mut. Ins. Co. v. Balogh, 272 F.2d 889 (5th Cir. 1959); Weinstock v. Prudential Ins. Co., 247 So.2d 503 (Fla.Ct.App.1971); Phoenix Ins. Co. v. Branch, 234 So.2d 396 (Fla. Ct.App.1970). The trial court concluded that Home discharged that burden, and we see no error in that finding. The policies obligated Home to pay damages caused by an insured in the performance of his professional services through neglect, error, or omission, or through dishonesty, misrepresentation or fraud, unless "committed by or at the direction of the insured, any officer or partner of the insured with affirmative dishonesty or actual intent to deceive or defraud." Home established at the garnishment proceeding that the acts made the basis of the trust account claim—namely Shriber's misappropriation of Duke's funds —were either not his "professional services" or were committed "with affirmative dishonesty or actual intent to deceive or defraud."

In the garnishment suit the trial judge took judicial notice of the record and judgment in the liability action. Also, Hoch, one of the partners in the accounting firm, was called as a witness by Duke and described the services performed by the firm for clients in the ordinary course of practice. These included tax advice, management counseling, and financial and business advice; receiving and paying bills; acting as trustee or executor; and receiving copies of brokerage confirmations of purchases and sales of securities and using the information in preparing clients' tax returns, analyzing their financial situation, and formulating financial advice. Hoch stated that the firm performed all the mentioned services for Duke during the years in issue in the liability suit. On cross-examination Hoch admitted that it was not part of "his practice," that is, his own practice and that of his partners and their employees, to make investments for clients, to lend clients' money, to borrow clients' money for personal use, or to render advice to clients as to the advisability of their buying particular stocks or bonds.

For expert evidence on the policy terms Duke relied on Dr. Richard Kip, a professor of insurance at Florida State University, and Allan Pither, a surplus lines agent who had been in the insurance business since 1939. Dr. Kip testified that "his practice," or "professional services," included whatever the particular insured did in the course of his specific business, regardless of whether he did it once or a hundred times and irrespective of whether the service is one normally performed within the area of accounting, so long as it is reasonable for an accountant to do. On cross-examination Dr. Kip opined that borrowing money from one client and lending it to another or using it for the accountant's own purposes was not within the realm of accountancy.

Pither also stressed the importance of "his" in the definition of "professional services" and said that "his practice" included a service performed just once by the insured. On cross-examination he testified that with respect to the policy in question, which was intended to cover an accountant, "unauthorized borrowing of money by the insured which had not

been paid back at the time of the claim would not be a covered situation." The District Judge concluded that "his practice" was a broad term encompassing services in some way related to accountancy and in fact performed by the insured, but that it did not include "lending of clients' money without approval, endorsing mortgages, borrowing money from trust accounts." Thus the court held that Home was not responsible under the policy for damages representing liability on the trust account claim.

Appellant's contention that the verdict at the first trial represented damages only for negligence was rejected by the District Judge, and is rejected here. The jury was allowed to consider liability only for the negligence claims, but was instructed to determine damages for the trust account claim, on which the trial court had instructed them to find liability and which formed the basis for noncovered acts. Duke insists that the District Judge's references at the main trial to negligence or lack of due care when speaking of the trust account claim during the charge conference (which concluded with his directing a verdict on that claim) established conclusively the nature of the judgment. The District Judge made plain, however, in his oral findings of fact in the case now on appeal, that those incidental references did not constitute findings of negligence, and that all he was deciding at that stage was "this plaintiff must recover a verdict in this case."

Thus the combination of the merits trial record and the testimony of Hoch, Dr. Kip, and Pither convinced the District Judge that the unallocated verdict represented in part liability for noncovered acts. Once Home established that part of the liability represented by the judgment was for noncovered acts, the burden became Duke's to prove the precise portion of the unallocated verdict representative of acts for which Home is responsible. Universal Underwriters Ins. Corp. v. Reynolds, 129 So.2d 689 (Fla.Ct.App.1961), a garnishment case, demonstrates the stringency of this rule.

A jury in an earlier contest between the injured parties and the insured had awarded lump sum damages totaling $2320.63 to Reynolds, and the insurer as garnishee took the position that the jury had arrived at this figure by commingling Reynolds' bodily injuries, which were covered, and his consequential damages resulting from injuries to his wife and son, which were not covered. The court said:

> From the record it is impossible to determine the particular amount that happened to be in the jury's mind as it returned the verdict with one figure therein. In the instant proceedings issue was reached by a sworn denial of the garnishee and a traverse by the garnisher. There was no evidence or proof of any kind as to how the jury's verdict should be divided, and it necessarily follows that the party having the burden of proof on this matter has not met its burden. If the burden of proof is placed upon the garnishee, this automatically makes the decision in favor of the garnisher; whereas, if the burden is on the garnisher, the decision automatically goes to the garnishee.

> . . . . . .

> . . . [T]he burden of apportioning these damages is on the party seeking to recover from the insurer. . . . That it is impossible for the plaintiff to do so in the case at bar does not change the basic predicament in which he finds himself.

*Id.* at 691. See also Morris v. Western States Mut. Auto. Ins. Co., 268 F.2d 790 (7th Cir. 1959); General Acc. Fire & Life Assur. Corp. v. Clark, 34 F.2d 833 (9th Cir. 1929); Yancey v. Utilities Ins. Co., 23 Tenn.App. 663, 137 S.W.2d 318 (1939). Unquestionably Duke failed to meet this burden, and, equally as certainly, it was impossible for him to do so—in fact Home admits that it was impossible and acknowledges that it is seeking the advantage of a very technical defense. Therefore, unless Duke is for some reason relieved of his burden of proof, Home must prevail. We find

that Duke is relieved of that burden, subject to the possibility noted below under part III.

The insurer undertaking the defense of a suit against its insured and having the right to control the litigation must meet a high standard of conduct.

> The right to control the litigation in all of its aspects carries with it the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common interest of the parties. . . .
>
> When the insurer undertakes the defense of the claim or suit, it acts as the agent of its assured in virtue of the contract of insurance between the parties, and when a conflict arises between the insurer, as agent, and assured, as principal, the insurer's conduct will be subject to closer scrutiny than that of the ordinary agent, because of his adverse interest. . . .

Traders & Gen. Ins. Co. v. Rudco Oil & Gas Co., 129 F.2d 621, 627 (10th Cir. 1942) (citations omitted). On the other side of the coin the insured is bound under the cooperation clause.[1]

In Fidelity & Cas. Co. of New York v. Stewart Dry Goods Co., 208 Ky. 429, 271 S.W. 444 (1925), the Kentucky court carefully charted the course of an insurance company defending against a complaint alleging both covered and noncovered acts:

> Where there are grounds of liability asserted by the employe, for some of which the insurer is liable and for some of which the insured must stand the loss, neither party has the right, without fault on the part of the other, to exclude the other from participating in the defense . . . . The insurer here was not required to regard simply the charge [for noncovered acts] by the insured and refuse to defend the action, thus taking its chances that this sole ground of liability would be established. On the other hand, it had the right to proceed with the action, *after giving full notice to the insured of the situation and giving it full opportunity to protect its rights.* All it was bound to do was fairly to assert its rights under the policy in such a manner as would be notice to the insured that it did not waive those rights, by proceeding with the defense of the action, and also *to do nothing in the defense of the action to the prejudice of the rights of the insured.* If it took any action in the defense, either by doing or failure to do anything in violation of the spirit of the contract in such a way as to cause the insured a loss, the insured, upon notice of this, had the right to assume the control of the defense.

*Id.* at 448 (emphasis added). In a suit for both covered and noncovered damages, the interplay of interests of insurer and insured with respect to the form of the verdict are but a part of the broader interplay of the entire defense, but there is not, however, presented in this case any question of discharge by the insurer of its obligations other than in relation to the form of the verdict. What is to be required of the insurer with regard to availability of an allocated verdict depends upon analysis of the interest of the parties, of the harm or prejudice that may come to them, and of the interest of effective judicial admin-

---

1. The insurer's duty to control the defense and the insured's correlative duty to cooperate in the defense derive from the policy itself. The policy in issue provides in pertinent part:

> "III. Defense . . . [T]he company shall: (a) Defend in his name and behalf any action or suit against the insured . . . even if such action or suit is groundless . . . but the company shall have the right to make such investigation and negotiation . . . as the company deems expedient. . . .
> \* \* \* \* \* \*
> . . . [T]he insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits."

See 7A Appleman, Insurance Law & Practice § 4681 (1942).

istration that absent harm there should be only one trial of the same issue.

Home has, of course, an interest in the verdict's not being allocated which is in conflict with the insureds' interest that covered damages be segregated. Insofar as the present record discloses, whether done ingeniously or ingenuously, Home, in control of the defense, has protected its interest and secured for itself an escape from responsibility at the expense of the insureds, who remain personally liable for the full judgment, unprotected even to the extent they have paid for protection. Having gained that advantage, Home insists upon it. The consequence to the insureds of a nonallocated verdict is the catastrophic total loss of coverage.[2] The risks to the insurer in requesting an allocated verdict are of no such magnitude, if of any consequence at all. A request for identification of the two types of damages reveals neither the presence of insurance nor the amount of coverage. Assuming as we must that the jury will follow instructions and make a correct allocation, the insurance company loses no benefit to which it is validly entitled from having the jury earmark the losses. Arguably the jury might, while complying with instructions, at its option throw damages into that category which it will speculate is insured. This is too tenuous to deserve more than mention. There may, however, be some awkwardness in argument to the jury, but this is nominal when balanced against the consequences to the insureds.

■■ Thus, at the merits trial Home's counsel was required to make known to the insured the availability of a special verdict and the divergence of interest between them and the insurer springing from whether damages were or were not allocated. The record before us does not indicate that counsel did so. Section 4(b) of the Statement of Principles of the ABA and the Conference Committee on Adjusters states:

> The companies and their representatives, including attorneys, will inform the policyholder of the progress of any suit against the policyholder and its probable results. If any diversity of interest shall appear between the policyholder and the company, the policyholder shall be fully advised of the situation. . . .[3]

Once Home's counsel disclosed the situation, the insureds, represented by their own retained counsel, would be entitled to make the decision whether to seek an allocated verdict.[4] The presence of insured's own counsel did not dispense with the necessity of insurer's counsel discharging his responsibility to disclose fully the precise situation before proceeding, as counsel having the right to control the defense, with a course of action inuring wholly to the insurer's benefit and wholly to the insureds' detriment.

■ Home's notification of defense under a reservation of rights was not a sufficient notification to the insureds that they should protect their interest by requesting an appropriate verdict. The reservation was no more than a general warning, sufficient to preserve Home's right to litigate coverage[5] but too imprecise to shield Home at a suit on the policy by the plaintiff's onerous burden of proving allocation.

Since on the present record the insurer failed to fully advise its insureds of the divergence of interest between it and them with respect to the verdict, the in-

---

2. This is true even if the proportion of non-covered to covered damages is small. The burden of proof shifts without regard to relative amounts.

3. This passage is quoted in 7A Appleman, *supra*, § 4681, at 426 n. 9.15.
 See also Canon 6, ABA Canons of Professional and Judicial Ethics 3 (1957):

> "It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts."

4. We do not explore the situation in which the insured does not have his own counsel.

5. See part II *infra*.

sureds[6] must, subject to the possibility noted in part III, *infra*, be freed of the impossible burden of proof placed on them. We discuss below in part III the procedure on remand.

The few cases on the subject are generally consistent with our conclusion. In Yancey v. Utilities Ins. Co., *supra*, husband and wife injured in an automobile collision sued an insured, who was covered by a standard 5/10 liability policy. The wife sued for her own injuries, and the husband sued for his injuries as well as for loss of consortium and medical expenses resulting from his wife's injuries. The insured was represented by the insurance company's counsel and his separately retained counsel. The insurer's counsel had requested an allocated verdict with respect to the husband's claim, which was denied by the trial judge. When the insurer's counsel attempted to make the denial grounds for a new trial, counsel for the insured objected, preferring to gamble on the plaintiff's recovering from the insurer the entire unallocated verdict rather than only a part of the verdict. General verdicts were returned of $7,500 for the wife and $2,500 for the husband. The insurer paid $5,000 toward the wife's judgment, but refused to pay any of the husband's, contending that his entire judgment could represent damages traceable to the wife's claim—namely loss of consortium and medical expenses—for which the insurer had already paid the policy limits. In a suit on the policy, the Tennessee appellate court upheld the insurer's contention on the ground that the insured had failed to meet his burden of proving allocation.

Morris v. Western States Mut. Auto. Ins. Co., *supra*, a diversity case applying Tennessee law, underscores the importance of the insurer's attempt in *Yancey* to obtain an allocated verdict. A wife injured in an automobile collision in which her husband was killed sought damages both for her own injuries and for the death of her husband. The in-

sured, who was covered by a 15/30/5 liability policy, was represented in the suit by insurer-retained counsel. At trial, the insurer's counsel suggested an allocation between damages for the wife's injuries and damages for the husband's death. Counsel for plaintiff objected to the allocation, the trial court upheld the objection, and the jury returned an unallocated verdict of $70,000. Pointing out that the verdict might represent damages solely for the wife's injuries (or the husband's death), the insurance company paid only $15,000. Plaintiff then sued on the policy, and the Seventh Circuit denied relief on the ground that plaintiff failed to meet her burden of proving allocation. Explaining *Yancey*, the court stated: "The Court there held that one who suggests separate verdicts cannot be estopped to claim that a single verdict for one lacks proof of damages to two persons. The record before us discloses such suggestion was made by counsel for Western and opposed by counsel for [plaintiff]." *Id.*, 268 F.2d at 793.

The duty to disclose allocation problems also influenced the court in Brewer v. Occidental Fire & Cas. Co., 219 Tenn. 584, 412 S.W.2d 210 (1967). As in *Yancey*, the plaintiff husband had obtained an unallocated verdict both for his own injuries and for loss of consortium and medical expenses caused by his wife's injuries. The insurance company, whose counsel had represented the insured at trial, refused to pay any portion of the judgment. The lower court summarily dismissed plaintiff's suit on the policy, in which plaintiff had alleged that the insurer had failed to warn the insured of the dangers of an unallocated verdict. Remanding the case on procedural grounds, the Tennessee Supreme Court stated that "[q]uestions of fact are presented with respect to issues of estoppel". *Id.* at 213. The court continued:

> Further, we are not impressed with the idea that an insurance carrier

---

6. And the judgment creditor. See discussion, *infra*.

should be permitted to escape liability for a judgment against its insured unless it very clearly appears that the insurance carrier is being required to incur obligations in excess of the provisions of its policy.

*Id.*[7]

The parties refer us to several Florida cases, all of which delineate the extent of the insurer's right to prove in garnishment proceedings the amount of damages representing liability for non-covered acts. These cases unequivocally support our affirmance of Home's right to prove liability for noncovered acts. Because of their factual settings, however, they uniformly do not discuss the problem of proving allocation, a problem arising only after the insurer has established that an unallocated verdict represents in part liability for noncovered acts.

Thus, in American Fire & Cas. Co. v. Blaine, 183 So.2d 605 (Fla.Ct.App.1966), the pleadings in the main case, which charged negligence and assault and bat-tery by the insured, were amended before trial to delete assault and battery. As the court pointed out, the carrier could not litigate the issue of intentional tort while defending the insured on a negligence charge, the damages for which would be covered. *Id.* at 606. It was, therefore, entitled in the garnishment case to raise the defense that the liability arose in fact from assault and battery, damages for which would not be covered, a contention which it could not have made in the merits case without creating between itself and the insured a divergence of interests which did not otherwise exist. In Columbia Cas. Co. v. Hare, 116 Fla. 29, 156 So. 370 (1934), the defense to coverage, asserted in the second suit, was one which could have been raised by the insurer on behalf of the insured in the prior adjudication with no divergence of interests arising, had the insurer not wrongfully withdrawn from the defense. The policy in issue, a typical employer's liability policy, excepted from coverage damages caused by independent contractors per-

---

7. The Florida court in Universal Underwriters Ins. Corp. v. Reynolds, 129 So.2d 689 (Fla.Ct.App.1961), which placed the burden of proving allocation on the garnishor, cited both *Yancey* and *Morris* approvingly. *Brewer*, the most recent in the Tennessee line of cases concerned with the burden of proving allocation, was decided after *Reynolds*.

Decided in the interim between *Morris* and *Brewer* was Maryland Cas. Co. v. Gordon, 52 Tenn.App. 1, 371 S.W.2d 460 (1963). In *Gordon* the Tennessee court adhered rigidly to the rule placing the burden of proving allocation on the person suing on the policy. Although the facts of *Gordon* reveal that the insurance company defended at the main trial and failed to warn of the dangers of an unallocated verdict, see 371 S.W.2d at 471 (dissenting opinion), the court omitted discussion of the relevance of the nondisclosure. The Tennessee Supreme Court made clear in *Brewer*, however, in which the plaintiffs alleged that nondisclosure should operate to relieve them of their burden of allocation, that the issue was still viable. Not only did the *Brewer* court state that "[q]uestions of fact are presented with respect to issues of estop-pel," 412 S.W.2d at 213, but also that "[t]his Court is certainly not inclined to extend the rule announced in Maryland Casualty Co. v. Gordon," *id.*

For New York cases in general accord with the principles of *Yancey*, *Morris* and *Brewer*, see Bogardus v. United States Fid. & Guar. Co., 269 App.Div. 615, 58 N.Y.S.2d 217 (1945); Clark v. Globe Indem. Co., 146 Misc. 697, 262 N.Y.S. 658 (Sup.Ct.), rev'd and rer-.aded per curiam, 240 App.Div. 916, 268 N.Y.S. 509 (Sup.Ct.App.Div.1933), aff'd and complaint dismissed per curiam, 266 N.Y. 478, 195 N.E. 162 (1934).

In General Acc. Fire & Life Assur. Corp. v. Clark, 34 F.2d 833 (9th Cir. 1929), plaintiffs argued that the insurance company's failure to suggest an allocated verdict at the main trial should operate to relieve plaintiffs of the burden of proving allocation at the suit on the policy. In support of their argument, plaintiffs cited Morrell v. Lalonde, 45 R.I. 112, 120 A. 435. The Ninth Circuit rejected their contention on the sole ground that "[t]his case is not in point." Such terse reasoning should not dispose of the substantial issues presented by the present appeal.

forming work for the insured. On the strength of this provision, the insurer sought to escape obligation by establishing that an independent contractor caused the injury. Whether styled as a policy exception, or as a shield to the respondeat superior theory of liability, the "independent contractor" defense was potentially beneficial to both insurer and insured. The insurer having had the opportunity to establish in the merits trial, without prejudice to the insured, that an independent contractor caused the injury, and having eschewed that opportunity by a wrongful withdrawal from the defense, it was precluded from raising the defense in the garnishment suit.

In American Sur. Co. of New York v. Coblentz, 381 F.2d 185 (5th Cir. 1967), the main suit, in state court, claimed damages for death of decedent, who was shot by the insured. The insurer withdrew from the defense, whereupon the insured, acting through retained counsel, stipulated with counsel for the plaintiff to testimony and to damages of $50,000. The trial court found that the insured was negligent, assessed damages at $50,000, and provided in the judgment that the damages were to be satisfied only out of public liability policies and were not to be satisfied from or be a lien upon any other assets of the insured. In the subsequent garnishment suit, on summary judgment, the federal district court held that the finding of negligence was binding upon the insurer. We reversed, holding that in a proceeding devoid of conflicting interests and based on only a partial presentation of the facts, the claimant and the insured could not stipulate away the insurer's right to raise in the garnishment case the legitimate coverage defense of assault and battery.[8] *Coblentz* does not require a different result than we reach in this case, where the insurer was defending and the issues were freely explored by conflicting litigants, and the problem became one of what the insurer must do to enable the insureds fully to protect their interests. Requiring the insurer to disclose to its insured the benefits of an unallocated verdict comports with the thrust of *Coblentz* and *Hare*—that coverage problems capable of resolution at the main trial should be resolved.[9]

In Commercial Union Ins. Co. of New York v. Reichard, 404 F.2d 868 (5th Cir. 1968), the insured had suffered a judgment for compensatory and punitive damages. The injured party had submitted his case on alternate theories of negligent hiring and respondeat superior, and the jury had returned a general verdict without specifying the basis for its awards. The insurer, in a declaratory judgment suit, argued that it must be

8. We read footnote 2 of *Coblentz*, 381 F.2d at 188 n. 2, which says that resolution of negligence versus assault and battery was neither relevant nor important to the controversy between the insured and the representative of the decedent to be limited to the particular circumstances of that case. Obviously it was not meant to be a rule for all cases. Were that not so the body of law that has grown up around what can and what must be raised at the merits trial, and its relation to what can be raised at a subsequent garnishment trial, would never have come into existence.

9. Caplan v. Johnson, 414 F.2d 615 (5th Cir. 1969), neither adds nor detracts from what we have said. On rehearing in *Caplan* we did make a fresh analysis of some coverage questions, and held that the false arrest for which the insured had been found liable at the merits trial constituted malicious prosecution within the meaning of policy terms. Our fresh analysis implicitly was dictated by the same considerations entitling the insurer in *Coblentz* to relitigate the issue of intentional tort. Thus the insurer in *Caplan* could not, for obvious reasons, argue at the merits trial that its insured committed a tort while denying that the tort was a malicious prosecution. Therefore, while *Caplan*, like *Coblentz*, indicates that a conflict of interests may prevent litigation of some coverage questions at the merits trial, no reading of *Caplan* will support the thesis that an insurer need not disclose to its insured at the merits trial the benefits of obtaining an allocated verdict.

relieved of obligation for punitive damages because the jury could have posited damages on either theory; whereas, it was responsible only if damages were awarded on the basis of negligent hiring. The court found that the District Judge had charged the jury on punitive damages only in regard to negligent hiring, so no allocation problem existed.

■ Duke, the plaintiff at the liability trial and the garnishor here, is a beneficiary of Home's duty of disclosure owed to the insureds. The policy that Duke seeks to garnish provides: "Any person . . . who has secured [a final judgment] . . . shall thereafter be entitled to recovery under this policy in the same manner and to the same extent as the insured." Under Florida law, which favors third-party beneficiary rights created by contracts of insurance to an almost unparalleled extent,[10] such a provision vests Duke with plenary rights under the policy. Auto Mut. Indem. Co. v. Shaw, 134 Fla. 815, 184 So. 852 (Fla.1938).[11] Cf. Flintkote Co. v. Brewer Co., 221 So.2d 784, 785 (Fla.Ct.App.), review denied, 225 So.2d 920 (Fla.1969). The duty to reveal conflicts of interest has its roots

in the relationship between the insured and the insurer, which arises by virtue of the contract of insurance. Duke, then, as beneficiary of the policy obligations, can assert the nondisclosure in this proceeding.

## II. Waiver and estoppel

Duke insists that we need not reach the allocation of damages problem because Home has waived its right to deny coverage and is estopped to deny coverage.

■ There was no waiver arising from Home's failure to secure from its insureds agreement to the reservation of rights. The reservation of rights, utilized to enable an insurer to meet vigorously and with undivided loyalty its duty to defend, while preserving for another time its day in court to determine its obligation under the policy to pay for the insured's liability, is well recognized in Florida, to whose law we are *Erie*-wed in this case. See Tiedtke v. Fidelity & Cas. Co., 222 So.2d 206 (Fla.1969); Johnson v. Dawson, 257 So.2d 282 (Fla. Ct.App.1972); Midland Nat'l Ins. Co. v. Watson, 188 So.2d 403 (Fla.Ct.App.

---

10. For example, in Florida on the strength of his third-party beneficiary rights, the victim of an automobile collision can join the insurer in an action against the insured. Shingleton v. Bussey, 223 So.2d 713 (Fla.1969). Moreover, as a third-party beneficiary, a person who has recovered a judgment against the insured can recover from the insurer an amount in excess of policy limits if the insurer negligently represented the insured at the main trial. Thompson v. Commercial Union Ins. Co., 250 So.2d 259 (Fla.1971). And in Maxwell v. Southern Am. Fire Ins. Co., 235 So.2d 768 (Fla.Ct.App. 1970), the injured person, as a third party beneficiary, was allowed to sue the insurer for medical coverage benefits without joinder of the insured.

11. In Auto Mut. Indem. Co. v. Shaw the policy provided:
 "[I]f . . . an execution on a judgment against Assured is returned unsatisfied, the judgment creditor shall

have a right of action against the Company to recover the amount of said judgment to the same extent that Assured would have had he paid the judgment."
184 So. at 855. The court held:
 "It seems that the creditor under the terms of the policy has a right of action against the insurance company to recover the amount of the judgment against the assured. The things contemplated by the terms of the policy have transpired which authorizes a right of action. The authorities are in harmony with the rule that one for whose benefit a contract is made, although not a party to the agreement and not furnishing the consideration therefor, may maintain an action against the promisor. In other words, a third person can enforce a contract entered into between others for his benefit."
*Id.* at 856.

1966). Midland Nat'l Ins. Co. v. Watson, *supra,* implies that a unilateral reservation is sufficient. The insurer there notified the insured through his attorney that it was undertaking defense under a reservation of rights, and after judgment in the liability suit the insurer and its insured signed a nonwaiver agreement. In a subsequent garnishment action the plaintiff-injured party contended that to prevent waiver of its rights the insurer was required to notify him also of its reservation of rights prior to trial of the liability case. The court held that an insurer need only give timely notice to the insured to reserve its right to claim lack of coverage, citing O'Dowd v. American Sur. Co., 3 N.Y.2d 347, 165 N.Y.S.2d 458, 144 N.E.2d 359 (1957). See also Johnson v. Dawson, *supra.* New York, whose law was relied upon as illustrative of the well-established rule adopted as the holding in *Watson,* had long before determined that notice to the insured of a reservation of rights, followed by silent acquiescence, protected the insurer. Zauderer v. Continental Cas. Co., 140 F.2d 211 (2d Cir. 1944) (diversity case applying New York law). See also Johnson v. Universal Underwriters, Inc., 283 F.2d 316 (7th Cir. 1960); 7A Appleman, Insurance Law & Practice, § 4694, at 546–47. We think that *Watson* sufficiently establishes the Florida law as identical to the New York rule.

Duke's estoppel contention is that Home is estopped from now litigating coverage because in the merits suit coverage was decided adversely to Home's present position and, alternatively, that coverage could have been presented and decided, and not having been presented may not now be raised. As to the former, the short answer is that coverage was not decided. As to the latter, the only extent to which coverage issues could be litigated was that of securing an allocated verdict, and this we already have discussed.

## III. Remand

In the District Court a threshold question is whether at the merits trial insurer's counsel, by some means not revealed by the present record, discharged his responsibility of notifying the insureds of their interest in the form of the verdict. If insurer cannot show that it did, the court will face the issue of attempting retrospectively to allocate the damages awarded. In saying that Duke is relieved of his burden, we refer to the "risk of non-persuasion." *IX* Wigmore, The Law of Evidence § 2485 (3d ed. 1940). Duke continues to have the burden of producing "a quantity of evidence fit . . . . to form a reasonable basis for the [judgment]," *id.* § 2487, at 279 (italics omitted). The primary source of evidence will be, of course, the transcript of the merits trial, containing the evidence on which the jury based its verdict. The trial judge, as trier of fact, will be in the position of establishing as best he can the allocation which the jury would have made had it been tendered the opportunity to do so. If it is impossible for the court to make a meaningful allocation based on only the transcript, Duke should have the right to adduce additional evidence and Home to present evidence in rebuttal.

## IV. Extent of policy coverage

The trial judge made an alternative finding that, in the event the garnishor was entitled to recover, the maximum liability of Home under the policy [12] was $50,000. In an understandable effort for judicial economy the trial judge made oral findings and did not reduce them to writing since they might never be put to use. The court considered the language of the policy itself, supplemented by other evidence which, though not identified, he stated to be equally or perhaps more pertinent than the policy language. While he referred to the policy as having become clear to him, we

---

12. Actually, two three-year policies.

must assume that he meant it was clear in the sense that he had been able to reach a decision as to its meaning and not in the sense that it was facially unambiguous, since if that were so he could not look to the other evidence in the case as an aid to construction. Rigel v. National Cas. Co., 76 So.2d 285 (Fla.1954); Goldsby v. Gulf Life Ins. Co., 117 Fla. 889, 158 So. 502 (1935); New Amsterdam Cas. Co. v. Addison, 169 So.2d 877 (Fla.Ct.App.1964). If other evidence was to be considered other principles of construction would come into play, including the rule that ambiguous contracts of insurance must be construed against the insurer. Rigel v. National Cas. Co., *supra*, Aetna Cas. & Sur. Co. v. Cartmel, 87 Fla. 495, 100 So. 802 (1924); L'Engle v. Scottish Union & Nat'l Fire Ins. Co., 48 Fla. 82, 37 So. 462, 466 (1904) ("Where two interpretations equally fair may be given, that which gives the greater indemnity will prevail."); Reliance Mut. Life Ins. Co. of Ill. v. Booher, 166 So.2d 222 (Fla.Ct. App.1964).

The evidence of policy meaning is confusing and conflicting. For example, the meaning of the term "claim" is central to the issue, but it is not defined in the policy. One expert, from another insurance company, had no difficulty stating an opinion as to what "claim" means in the policy, but acknowledged that his own company had encountered so much difficulty over the meaning of that term in relation to its policies of the same type that it had amended them to include a definition. Another expert conditioned his opinions on possible meanings of "claim," which he stated he was unable to define with relation to the policy.

These problems mandate reconsideration and entry of written findings and conclusions. Under the circumstances, we vacate the finding that the liability of Home is limited to $50,000 and remand for fresh consideration of that issue and entry of written findings and conclusions.

Reversed and remanded.