Harry Peter BUYSSE, et al., judgment
creditors, Respondents,

v.

BAUMANN–FURRIE & COMPANY,
Judgment Debtor,

v.

ST. PAUL FIRE & MARINE INSUR-
ANCE COMPANY, judgment
garnishee, Petitioner, Appellant.

No. C4–88–228.

Supreme Court of Minnesota.

Sept. 22, 1989.

Rehearing Denied Dec. 13, 1989.

Kay Nord Hunt, Philip A. Cole, Lommen, Nelson, Cole & Stageberg, Minneapolis, for petitioner, appellant.

Robert M. Halverson, Gislason, Dosland, Hunter & Malecki, New Ulm, John C. Hottinger, Hottinger Law Offices, Mankato, Lynn Truesdell, Bassford, Heckt, Lockhart, Truesdell & Briggs, Minneapolis, and Samuel Hanson, Briggs & Morgan, Minneapolis, for respondents.

COYNE, Justice.

On the petition of St. Paul Fire & Marine Insurance Company (hereinafter "St. Paul F & M"), we review the decision of the court of appeals affirming judgment in the amount of $1 million against St. Paul F & M, the garnishee in proceedings based on a judgment entered in an accounting malpractice action against a St. Paul F & M insured. 428 N.W.2d 419. We reverse and remand.

The main action arose out of the insolvency of Ghent Grain & Feed, Inc. Eighty-two of Ghent's creditors and Ghent's trustee in bankruptcy sued Baumann–Furrie & Company, alleging that Baumann–Furrie, which had performed accounting services for Ghent from the mid–1970's until March 1983, had negligently prepared Ghent's financial statements and negligently failed to notify plaintiffs after discovery that such financial statements were inaccurate. St. Paul F & M, Baumann–Furrie's public accountants' errors and omissions insurer, acknowledged that the claims were within the coverage afforded by its policy and engaged counsel to defend the actions against Baumann–Furrie. In defending

the claims of the several plaintiffs, St. Paul F & M took the position that its limit of liability was $500,000, the "each error limit" set out in the policy:

> The each error limit is the most we'll pay for all claims resulting from a single error or series of related errors, no matter how many protected persons, injured parties or claims are involved.

Baumann–Furrie, on the other hand, contended that its liability, if any, resulted from multiple unrelated errors, thus invoking the $1 million total policy limit of coverage:

> The total limit, which is twice the each error limit, is the most we'll pay for all claims reported in a policy year.

After trial of the main action had begun, Baumann–Furrie and the 83 plaintiffs entered into a stipulation of settlement which the parties characterize as a "Miller–Shugart" settlement.[1] See Miller v. Shugart, 316 N.W.2d 729, 735 (Minn.1982). The stipulation, executed on Baumann–Furrie's behalf not only by Baumann–Furrie's personal counsel, but also by counsel engaged by St. Paul F & M pursuant to its contractual obligation to defend its insured, provided that the district court should issue findings of fact and conclusions of law and enter judgment that Baumann–Furrie was negligent in the preparation of semi-annual financial statements of June 30, 1979 through June 30, 1982, and in Baumann–Furrie's conduct on discovery that the statements were materially incorrect and that such negligence was the proximate cause of the plaintiff's damages in excess of $1 million. The stipulation recited a $500,000 settlement offer by St. Paul F & M, notification of the parties' intention to enter into the stipulation, and St. Paul F & M's declination to join in the stipulation. Finally, the stipulation limited collection and satisfaction of the plaintiffs' judgment to St. Paul F & M's obligation pursuant to its policy or policies insuring Baumann–Furrie. The trial court made findings of fact and conclusions of law and judgment was entered, all in accordance with the stipulation.

Thereafter, the judgment creditors served a garnishment summons and a supplemental summons and complaint on the St. Paul Companies, St. Paul F & M's parent company. St. Paul Companies denied that it was indebted to or insured Baumann–Furrie, alleged that its affiliated corporation, St. Paul F & M, insured Baumann–Furrie, and alleged breach of the insured's contractual obligations and that the creditor's judgment was both defective and unreasonable.

The judgment creditors then moved to substitute St. Paul F & M for the St. Paul Companies as garnishee and for an order summarily determining that the Stipulation for Entry of Judgment dated January 28, 1987 was in all respects reasonable and binding on the garnishee as well as the judgment debtor. The judgment creditors also sought summary judgment against the garnishee in the amount of $500,000, plus interest, reserving for future disposition only the issue of the extent of the policy limits. At the same time the St. Paul Companies moved for summary dismissal of the garnishment action and for disqualification of Gislason, Dosland, Hunter & Malecki from acting as counsel for the judgment creditors. The district court denied the St. Paul Companies' motions; ordered St. Paul F & M substituted as garnishee in place of St. Paul Companies; ordered the judgment creditors to serve on St. Paul F & M and file an amended supplemental summons and complaint, which would relate back to the date of the original pleadings, and prohibited St. Paul F & M from filing a response thereto; and awarded summary judgment against St. Paul F & M in the amount of $500,000 with costs and disbursements.

The judgment creditors served an amended supplemental summons and complaint

---

1. The stipulation recites the pendency of a similar action commenced in Scott County by Kellogg Commission Company, its claim as creditor in the Ghent bankruptcy, and the inclusion of its claim in the damage claim of the Ghent bankruptcy trustee in the subject action. Kellogg Commission Company consented to the settlement stipulation and agreed to dismiss its action and release all claims against Baumann–Furrie.

on St. Paul F & M. On motion the district court permitted St. Paul F & M to file its tendered response after striking all jurisdictional defenses.

Subsequently the judgment creditors notified St. Paul F & M of the association of John C. Hottinger with the Gislason firm to represent the judgment creditors regarding the amount of insurance available pursuant to the St. Paul F & M policy for satisfaction of the judgment creditors' claims against Baumann–Furrie. Then they moved for summary judgment that St. Paul F & M's "insurance coverage limit as applied to this action is One Million Dollars ($1,000,000)." Reasserting its jurisdictional defenses, St. Paul F & M also moved for summary judgment. On December 22, 1987 the trial court awarded the judgment creditors a second summary judgment in the amount of $500,000 and ordered entry of all judgments previously granted. Judgment was entered pursuant to that order, and St. Paul F & M appealed. The court of appeals affirmed in all respects. This court granted further review.

Before addressing the merits of the case it seems desirable to decide whether the law firm of Gislason, Dosland, Hunter & Malecki, counsel for the judgment creditors, should be disqualified from any further participation in the lawsuit. St. Paul F & M asserts that it has regularly engaged the Gislason firm over the last 20 years and that the firm has advised or represented St. Paul F & M in more than 15 matters in the last three years, and it contends that the Gislason firm's representation of the judgment creditors in the garnishment proceeding violates Rule 1.7, Minnesota Rules of Professional Conduct:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
(2) each client consents after consultation.

Robert Halverson, a member of the Gislason firm and lead counsel in the representation of the judgment creditors, avers that he works in the firm's New Ulm office and that representation of St. Paul F & M is handled by the firm's Minneapolis office, that he has never represented St. Paul F & M and has never participated in any "internal discussions of the affairs of St. Paul" F & M, and that he has never had access to any file in which a member of the Gislason firm represented St. Paul F & M. In addition, the Gislason firm and Mr. Halverson agreed to withdraw from representation of the judgment creditors if summary judgment were granted with respect to the reasonableness of the Miller–Shugart settlement. Thereafter independent counsel was associated with the firm to represent the judgment creditors in the determination of the coverage question.

The district court ruled that the agreement to withdraw rendered the question moot, a position which neither the court of appeals nor this court regard as an abuse of discretion. In the light, however, of the subsequent course of this litigation some further comment is in order.

■ Disqualification of counsel is a part of a court's duty to protect the attorney-client relationship, an obligation necessary to the maintenance of public confidence in the legal profession and the protection of the integrity of the judicial process. *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1576 (Fed.Cir.1984). In recognition of the necessity that the court be guided by an "awareness of the delicate balance which must be maintained between the right of an individual to retain counsel of his free choice" and the need for upholding ethical standards, *id.* at 1577 (citation and emphasis omitted), this court has adopted a well-defined approach to the question of disqualification:

(a) Considering the facts and the issues involved, is there a substantial, relevant relationship or overlap between the subject matters of the two representations?
(b) If so, then certain presumptions apply: First, it is presumed, irrebuttably, that the attorney received confidences from the former client and he or she will not be heard to claim otherwise. Second,

it is also presumed, but subject to rebuttal, that these confidences were conveyed to the attorney's affiliates.

(c) Finally, at this stage, if reached, the court weighs the competing equities.

*Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 731–32 (Minn.1983) (citations omitted).

Although the Gislason firm withdrew following the order for summary judgment with respect to the reasonableness of the *Miller–Shugart* settlement, that withdrawal and the engagement of independent counsel was limited to representation of the judgment creditors in the determination of the coverage question. On appeal, however, the Gislason firm and the Hottinger law offices (the independent counsel) filed a joint brief in which there is no discernible line of demarcation between insurance coverage issues and other issues involved in this litigation. Although we assume that the lawyers in question confined their activities on appeal to their respective spheres of representation, we are constrained to remark that separate briefs would have been a more fitting way to carry out the undertaking to separate representation on the coverage issues from representation on all other issues.

■ The fact that a law firm engaged in insurance defense work for a particular insurance carrier represents the plaintiff in an action against an insured of that carrier does not necessarily signify a disqualifying relationship or overlap in representation of the insurance carrier. Furthermore, even if there were a substantial, relevant relationship or overlap between representation of the St. Paul F & M in other matters regarding the applicability or extent of insurance coverage and representation of the judgment creditors with respect to issues other than coverage questions, Mr. Halverson's representation that he was not privy to any aspect of the representation of St. Paul F & M is uncontroverted. Therefore, we are required to weigh the competing equities.

Halverson and the Gislason firm began representing the judgment creditors long before the question of the applicable insurance limits surfaced. The action, with its very complex procedural history, had been pending for almost two years when, during settlement negotiations carried on while the trial was in progress, the question of the insurance limits applicable to the claim was first raised. Surely the St. Paul F & M was aware all during the pendency of the action that the aggregate claims of the plaintiffs, including an action pending in another judicial district, exceeded the limit of coverage St. Paul F & M regarded as available for the payment of those claims. Even though it was not a party to the main action, it was in a position to anticipate the potential conflict of which it now complains and to voice its objection informally. At this late date it would, we believe, work a severe hardship on the judgment creditors to deny them their chosen counsel in the prosecution of the questions of liability and damages in the main action, and we conclude that in balancing the equities the trial court did not exceed the bounds of proper discretion in denying St. Paul F & M's motion to disqualify plaintiffs' counsel.

■ St. Paul F & M directs its initial attack upon the district court's jurisdiction over either the subject matter of the garnishment or the person of the St. Paul F & M. It complains that the judgment entered in the main action is not a final judgment and, therefore, will not support the issuance of a garnishment summons because the judgment does not specify the portion payable to each judgment creditor. The judgment is, of course, the product of agreement between the defendant and the 83 plaintiffs in these consolidated cases. It resolves all disputes between defendant and all plaintiffs. This is not a class action; despite the large number of plaintiffs, they are all named plaintiffs, and there is no necessity for court ordered disposition of unclaimed funds or court approval of attorney fees. *Compare Parks v. Pavkovic*, 753 F.2d 1397, 1401–02 (7th Cir.1985) (appealable final judgment where only ministerial tasks remained in the determination of individual judgments) *with Strey v. Hunt International Resources Corp.*, 696 F.2d 87, 88 (10th Cir.1982) (no appealable final judgment where division of damages,

disposition of unclaimed funds, and measure of attorney fees not determined). Satisfaction of the judgment can be obtained by paying the face amount of the judgment, including costs and disbursements, plus accrued interest. Any disagreement among the judgment creditors about distribution of the proceeds can be resolved without the participation of the former judgment debtor. The failure to allocate the judgment among the plaintiffs may well, as St. Paul F & M contends, impede determination of the reasonableness and prudence of the settlement on which the judgment rests. We note also that had the main action included claims for damages outside the coverage of the St. Paul F & M policy as well as claims for damages within the policy coverage, there might be some basis for the contention that the insurer's contractual liability on the judgment cannot be determined without an apportionment of damages. *See, e.g., Duke v. Hoch,* 468 F.2d 973, 978–79 (5th Cir.1972); *Buckley v. Orem,* 112 Idaho 117, 123–25, 730 P.2d 1037, 1043–45 (Ct.App.1986). But these are matters of proof, not of jurisdiction. Accordingly, the judgment against Baumann–Furrie is a final judgment on which a garnishment summons may issue. Minn.Stat. § 571.42, subd. 1 (1988). We hold that the district court had jurisdiction over the subject matter in this garnishment proceeding.

St. Paul F & M also argues that the court lacks personal jurisdiction over it because a garnishment summons was not served upon it. The judgment creditors initiated the garnishment proceedings by serving a garnishment summons and disclosure form pursuant to Minn.Stat. § 571.471 (1988) on the St. Paul Companies. Following the garnishee's denial of liability, the judgment creditors, by leave of court, served a supplemental complaint making the St. Paul Companies a party to the action and setting forth the facts on which the judgment creditors claimed to charge the St. Paul Companies. Minn.Stat. § 571.51 (1988). When the St. Paul Companies averred in its answer that its "affiliated" company, St. Paul F & M, had issued the liability policy insuring Baumann–Furrie, the district court granted the judgment creditors' motion for leave to amend their pleadings. Ruling that the requirements of Rule 15, Minn.R.Civ.P., had been met,[2] the court ordered substitution of St. Paul F & M as garnishee in place of the St. Paul Companies and ordered the judgment creditors to serve and file an amended supplemental summons and complaint which should relate back to the original date of the pleadings. While ordering substitution of St. Paul F & M as garnishee, however, the district court ordered neither amendment of the garnishee summons nor service on St. Paul F & M.

Garnishment is not an independent action but is a proceeding ancillary to the main action, initiated by service of a garnishee summons and continued by supplemental complaint. *Roinestad v. McCarthy,* 249 Minn. 396, 405, 82 N.W.2d 697, 703 (1957); *Gilloley v. Sampson,* 203 Minn. 233, 237, 281 N.W. 3, 5 (1938). The purpose of garnishment is to reach property of the defendant in the hands of the garnishee in order to apply it in satisfaction of the judgment. *Id.* at 237, 281 N.W. at 5. The proceeding is one in the nature of an involuntary action by the defendant against the garnishee for the benefit of the plaintiff. *S.T. McKnight Co. v. Tomkinson,* 209 Minn. 399, 400–01, 296 N.W. 569, 570 (1941).

**2.** The district court declared that the substitution was timely; that St. Paul F & M had received notice of the garnishment action shortly after service of the garnishment summons on St. Paul Companies and would not be prejudiced in maintaining a defense on the merits; and that St. Paul F & M knew that a mistake had been made and that the garnishment summons should have been served on the St. Paul F & M because shortly after commencement of the garnishment by service of St. Paul Companies, St. Paul F & M notified counsel for the judgment creditors that St. Paul F & M was the insurer and the proper garnishee and that it was a wholly-owned subsidiary of St. Paul Companies. The district court noted also that the stipulation of settlement had named St. Paul F & M as the insurer. On these facts, dismissal of the garnishee and commencement of a new garnishment proceeding would have been a more appropriate disposition of the matter.

Because garnishment is commenced by service of the garnishment summons, it seems to us that a motion to substitute a different garnishee necessarily contemplates amendment of the garnishment summons as well as the supplemental summons and complaint if the proceeding is to continue as a garnishment proceeding. Accordingly, we are of the opinion that implicit in the order substituting St. Paul F & M as garnishee is a direction to amend the garnishment summons as well as an amended supplemental summons.

 St. Paul F & M complains, however, that the garnishee summons was not served upon it. Although the general rule for substitution of defendants is that service is required unless the substitution or amendment is done merely to correct a technicality, C. Wright & A. Miller, *Federal Practice and Procedure* § 1085, at 21 (5th ed. 1982), we have held that if service of a summons and complaint results in an intended defendant being fully informed of the pendency and nature of the action, the court has acquired jurisdiction over that defendant even despite a misnomer. *Lange v. Johnson*, 295 Minn. 320, 324, 204 N.W.2d 205, 208 (1973), *citing Nelson v. Glenwood Hills Hosp.*, 240 Minn. 505, 511–13, 62 N.W.2d 73, 77–78 (1953) (two corporations with some of same officers and directors). Substitution of a parent corporation for its subsidiary has been characterized as the correction of an inadvertent misnomer which did not necessitate service on the substituted party. *See Infotronics Corp. v. Varian Assoc. Corp.*, 45 F.R.D. 91, 93 (S.D.Tex.1968); *see also Galion v. Conmaco Int'l, Inc.*, 99 N.M. 403, 406–07, 658 P.2d 1130, 1133–34 (1983) ("identity of interest" sufficient to allow substitution of parent corporation for subsidiary to relate back even though statute of limitations had run after filing of action against subsidiary). *But see Schiavone v. Fortune*, 477 U.S. 21, 28–29, 106 S.Ct. 2379, 2383–84, 91 L.Ed.2d 18 (1986) (Court does not reach "identity of interest" issue).

Although the tenor of the memorandum which is a part of the district court's order suggests that the court determined that St. Paul F & M was fully informed of the pendency and nature of the proceeding despite the misnomer, the order requires service of the amended supplemental summons and complaint. Inasmuch as the amended supplemental summons and complaint were actually served on St. Paul F & M, we have no doubt that the court thereby acquired jurisdiction over St. Paul F & M. This court has long been committed to the principle that technical or formal defects which do not affect substantial rights and which could not have misled or prejudiced the adverse party should be disregarded. *E.g., Hanna v. Russell*, 12 Minn. 80, 85 (Gil. 43, 45) (1866). And if the effect of the failure to serve or require service of the garnishment summons was the inadvertent conversion of the garnishment proceeding into an action in the nature of a creditor's bill or an involuntary declaratory action by the judgment debtor for the benefit of the judgment creditors, we have little doubt that attachment of the policy is not essential to the performance of any obligation St. Paul F & M may have toward its insured.

 The central issue in this case is the force and effect of the judgment entered on the stipulation for settlement into which Baumann–Furrie and the plaintiffs entered. That the judgment is binding on the stipulating parties is undisputed. The district court ruled, however, that St. Paul F & M, though not a party to the stipulation was bound by it. The ruling was premised on the determination that one of the signers of the stipulation, counsel engaged by St. Paul F & M to conduct Baumann–Furrie's defense, had apparent authority to bind St. Paul F & M. It is clear, however, from the language of the stipulation itself that St. Paul F & M declined to enter into the stipulation and that counsel was not acting on its behalf in entering into the stipulation. The stipulation recites that the St. Paul F & M had been requested several times to enter into negotiations directed to a settlement in excess of $500,000, that St. Paul F & M had been notified that the parties intended to enter into a stipulation for entry of judgment against Baumann–Furrie in the amount of $1 million, and that

St. Paul F & M "again declined to consider paying any settlement above $500,000." That language forecloses any contention that St. Paul F & M caused the judgment creditors to believe that it authorized counsel to bind it to the stipulation or that the judgment creditors believed that counsel was authorized to enter into the agreement on its behalf.[3] Indeed, it must have been apparent to the judgment creditors that counsel engaged to defend the insured was acting contrary to the insurer's instructions. There is, therefore, no basis for concluding counsel had "apparent authority" to bind St. Paul F & M to the stipulation.

Characterizing their agreement as a *Miller–Shugart* stipulation for settlement, Baumann–Furrie and the judgment creditors argue that Baumann–Furrie's potential exposure to liability exceeded $1 million; that St. Paul F & M conceded the availability of policy limits of only $500,000; and that, therefore, Baumann–Furrie had the right to protect itself against personal liability in excess of $500,000 by entering into this agreement. While the argument is superficially appealing, on second glance it founders on the rock of reality lurking just below the surface: the same argument can be made whenever a claim exceeds the limits of the defendant's insurance coverage. It is *always* in the best interest of the insured to enter into an agreement which completely eliminates the insured's exposure to personal liability for damages and in many cases, by continued denial of fault, damage to the insured's reputation as well. But that fact does not justify the insured's concession of liability for damages equal to the maximum aggregate limits of its insurance coverage. Only the insurer's denial of the existence of *any* coverage for the claim and the resultant exposure of the insured to liability for the entire amount of any damage award pro-vide a basis for requiring the insurer's right to the insured's cooperation to yield to the insured's need to extricate himself or herself without the insurer's agreement. *Miller v. Shugart*, 316 N.W.2d at 734–35; *Clemens v. Wilcox*, 392 N.W.2d 863, 867 (Minn.1986).

Moreover, the determination in *Miller v. Shugart* that the insureds had not breached their duty to cooperate with the insurer did not depend simply on the denial of coverage. There was a certain distance in the relationship between the facts on which the coverage question depended and those governing the issues of liability and damages in the main action. Miller was injured while a passenger in an automobile owned by Lacoshonas and operated by Shugart. The owner's insured denied coverage to Shugart on the ground that he was not the owner's agent. The insurer instituted a declaratory action and while the insurer's appeal in that action was pending, Miller and the insureds entered into a settlement stipulation for an amount in excess of the owner's policy, collectible only from any applicable insurance. Following this court's affirmance of the independent determination in the declaratory action that Shugart was an insured within the policy coverage, this court held that, "on the facts of this case" the insureds did not breach their duty to cooperate with the insurer by settling directly with Miller. *Miller v. Shugart*, 316 N.W.2d at 734. Included in "the facts" to which the decision in *Miller v. Shugart* is limited, is the fact that the stipulation for settlement of the main action did not purport to control the question of coverage, which was the subject of an independent action—whether the use of the automobile was permissive is unrelated to whether the automobile was operated negligently and to the amount of the plaintiff's damages.

**3.** We are not unmindful of our adjuration that counsel who undertakes to represent a policyholder owes to the policyholder the same "undeviating and single allegiance" that counsel would owe to the client if retained and paid by the insured rather than the insurer. *Newcomb v. Meiss*, 263 Minn. 315, 322, 116 N.W.2d 593, 598 (1962); *see also Crum v. Anchor Casualty Co.*, 264 Minn. 378, 391–92, 119 N.W.2d 703, 712 (1963). Inasmuch, however, as Baumann–Furrie was represented by independent counsel with respect to exposure to loss in excess of insurance coverage, execution of the stipulation by counsel engaged by the insurer as well as counsel engaged by the insured is rather puzzling.

Clearly, the nature of a dispute over applicable limits of liability differs sharply from that of a dispute over the existence of coverage. In a sense the dispute here over liability limits more closely resembles a difference of opinion with respect to an evaluation of the probable outcome of the litigation, for the solution to the question depends on what is proved in the main action.[4] Because of this difference in the nature of the dispute, the impact of the insured's conduct in the present case is very different from the impact of conduct which results in an enforceable *Miller–Shugart* settlement. The initial basis for a *Miller–Shugart* settlement is the insurer's denial of *any* coverage for the claim against the insured. Thus, before the insurer has any obligation to pay the judgment entered on the stipulation, it has the opportunity to test its policy defense; and if the insurer's denial of coverage is upheld, that is the end of the matter. If, on the other hand, the insurer acknowledges that its policy covers the insured's liability to the extent of a specified monetary limit, when the insured admits liability in excess of that limit, the insured would unilaterally obligate the insurer to pay its conceded limit of liability before it could assert any policy defense.[5]

Moreover, the stipulation in the present case is unabashedly directed to the resolution of the coverage question by the insured's concession not only that it was negligent but that it was guilty of various unrelated acts of negligence which caused damages in excess of $1 million.[6] This stipulation for settlement, executed by Baumann–Furrie over its insurer's protest, is the coup d'etat by which the insured has wrested control of the lawsuit from the insurer, stripping it of its contractual right to defend and settle the action, and thus violating the insured's covenants.

Good faith and fair dealing between insurer and insured are, of course, correlative obligations, *Larson v. Anchor Cas. Co.*, 249 Minn. 339, 353, 82 N.W.2d 376, 385 (1957), and this guideline has been set for the governance of the conduct of insurer and insured under circumstances like those encountered in the present case:

> Where a claim is made against an insured which may exceed policy limits, and where the insured and insurer may each incur liability, then each assumes an obligation to act in good faith, to face the facts realistically, and to maintain a mutual respect for the interests of the other.

*Sargent v. Johnson*, 551 F.2d 221, 231–32 (8th Cir.1977).

In this case, the insurer not only met its contractual obligation to defend the insured, but, unlike its counterpart in *Mil-*

---

4. We have previously recognized that insurance coverage questions are not always amenable to resolution by declaratory actions. *Prahm v. Rupp Constr. Co.*, 277 N.W.2d 389, 390–91 (Minn.1979). It is apparent that the extent of the applicable limits of the insurance afforded by St. Paul F & M's policy depended on whether Baumann–Furrie's conduct was found in the main action to be negligent and, if so, whether the negligence involved a single act or a series of related acts or whether there had been two or more unrelated acts of negligence. A declaratory action was not an acceptable alternative, for it would have placed the insured in the untenable position of arguing that it was guilty of not one but of two or more unrelated negligent acts, each of which caused damage to the claimants.

5. If, as in the present case, the amount of the settlement stipulation is twice the conceded policy limit, acceptance of the reasonableness of the settlement—at least to the extent of the conceded policy limits—would seem rather likely.

6. The St. Paul F & M has taken a two-pronged position with respect to limit of its liability in this matter: if the insured is liable to the plaintiffs, the liability arises out of an error or a series of related errors and is, therefore, insured only to the extent of $500,000; and if liability is based on two or more unrelated errors, the limit of the insurance coverage depends on the amount of damage caused by each error. In the latter event, the $500,000 limit for each error remains in place and the aggregate limits of liability for damages from all errors is $1 million. While the insured and the plaintiffs all have agreed that the insured's liability arises out of several unrelated errors, the record does not disclose any attempt to tie damages to specific errors. It occurs to us, however, that the aggregate amount of the judgment creditors' claims in the Ghent Grain bankruptcy proceeding remaining unpaid at the time of trial may not be an appropriate measure of damages.

*ler v. Shugart,* it also conceded that all of the conduct alleged by the various plaintiffs falls within the coverage afforded by its policy. The dispute between the insurer and the insured here is not whether the policy covers the insurer's liability, if any, but rather the extent to which any liability is covered. Of course, an insurer which refuses in bad faith to settle within its policy limits, subverting the insured's interest to its own, does so at its peril, *Short v. Dairyland Ins. Co.,* 334 N.W.2d 384, 387–88 (Minn.1983), but it is not here contended nor, on the record before us, can it be contended that St. Paul F & M did not have good faith reason to refrain from offering $1 million in settlement of this action. *Boerger v. American General Ins. Co.,* 257 Minn. 72, 75, 100 N.W.2d 133, 135 (1959). We agree with the United States Court of Appeals that a liability insurer which does not deny that some part of the claim against its insured is within the coverage provided by its policy and which affords its insured a defense to a pending action for damages does not breach its contract of insurance by disputing with its insured the amount of coverage that is available for the satisfaction of any judgment against the insured. *Sargent,* 551 F.2d at 230.[7] We hold that the St. Paul F & M did not breach its insurance contract in this case.

In *Sargent* the Court of Appeals went on to hold that by entering into a settlement agreement without the concurrence or consent of its insurance carrier an insured had not only breached the insurance policy but had also failed to deal with its insurer in good faith, thereby effectively severing the insurer-insured relationship. *Id.* at 232.[8] Although we are disinclined to characterize Baumann–Furrie's entry into the settlement stipulation as bad faith conduct, we do recognize that the insured's conduct amounts to a breach of contract which voids coverage if it is material and prejudicial. *Juvland v. Plaisance,* 255 Minn. 262, 268–69, 96 N.W.2d 537, 541–42 (1959). Certainly the settlement agreement, designed to resolve all disputed issues against the insurer and dispose of the lawsuit, was material. Equally certainly, the stipulation prejudiced the insurer's position with respect to the disputed policy limits, for the insured stipulated that it had been guilty of various negligent acts which the stipulation characterized as unrelated and that its negligence had caused the plaintiffs to sustain damages in excess of $1 million. The concession in respect of causal relationship between negligence and damages is of significance in this case. Relying on dicta contained in *Bonhiver v. Graff,* 311 Minn. 111, 248 N.W.2d 291 (Minn.1976), the judgment creditors do not assert direct reliance on the financial statements prepared by Baumann–Furrie, or even that they acted with an awareness of the existence of the statements, but only that the statements were submitted to the United States Department of Agriculture in satisfaction of grain warehouse licensing requirements. Because of the posture of the case, however, we do not decide whether *Bonhiver* should be extended to include such a claim.

 Ordinarily, when an insurer has acknowledged the existence and applicability of coverage with respect to a pending action, the deprivation of the contractual right to defend and settle the lawsuit attendant upon the execution of a stipulation for settlement prejudices the insurer and voids the policy coverage. The tenor of the stipulation of settlement and the circumstances under which it was negotiated and presented to the trial judge, however, sug-

---

7. We reject the theory of anticipatory breach adopted in *Arizona Property & Casualty Ins. Guaranty Fund v. Helme,* 153 Ariz. 129, 735 P.2d 451, 459 (1987). We note, too, that the effect of the insurer's position there was to deny the availability of any coverage to one of its insureds.

8. "[T]he insured not only breached its contract, but acted in bad faith. Counsel for the insured did not enter into a bargain to settle its liability claims for a fair price, but entered into a questionable collaboration by which the parties maneuvered through terms of a settlement agreement to impose an uncompromised full balance of a judgment upon the insurer, while the insured incurred no real detriment." *Sargent,* 551 F.2d at 232.

gest to us that the stipulation may have been executed with the understanding, shared by the insurer, that whatever chances the parties took with respect to the disputed limits, entry into the stipulation would not jeopardize coverage to the extent of the conceded limit of $500,000. Because we cannot determine on the record before us whether the insurer joined in an agreement to recognize the continued vitality of the insurance coverage to the $500,000 limit, we remand to the trial court for determination of that fact issue.

Absent such an agreement, the policy is void. If it should be determined that the insurer agreed that its conceded limits of $500,000 should remain in force despite the stipulation of settlement, then, it seems to us, the trial court might, on the judgment creditors' motion, set aside the stipulated judgment on such terms with respect to costs, fees and disbursements as may be appropriate and reopen the main action for trial on all issues.

Reversed and remanded for further proceedings in accordance with this opinion.