**FIRST NATIONAL BANK OF LINCOLNWOOD, Plaintiff,**

v.

**Arthur KELLER, Defendant.**

**No. 68 C 1272.**

United States District Court, N. D. Illinois, E. D.

Sept. 16, 1970.

Donald R. Harris and Ronald J. Clark, Jenner & Block, Chicago, Ill., for plaintiff.

Austin L. Wyman, Jr., Cummings & Wyman, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

■ This is an action by the First National Bank of Lincolnwood ("Bank"), a national banking association doing business in Lincolnwood, Illinois, against Arthur C. Keller ("Kel-

ler"), its former president and director, to impose liability for the loss of approximately $250,000 resulting from the failure of certain obligors to repay loans made by the Bank. Count 1 alleges that Keller participated in and assented to loans in excess of the Bank's lending limit, in violation of the National Banking Act, 12 U.S.C. §§ 84 and 93. Count 2, based on the same factual averments, seeks to impose common law liability for negligence, mismanagement, and violation of fiduciary duties. This court has jurisdiction as to Count 1 pursuant to 28 U.S.C. § 1331 and pendent jurisdiction as to Count 2.

Trial was held to the court, sitting without a jury, on January 19th through 22nd, 1970. Post-trial memoranda and proposed findings of fact and conclusions of law have been filed, and the following constitutes the court's findings and conclusions in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

Defendant Keller and a group of other investors purchased plaintiff Bank in 1964. In September of that year Keller was named Executive Vice-President, and he became President in January, 1965. He retained this position until his resignation on September 1, 1966. From the time of his acquisition of an interest in the Bank until his resignation, defendant was a member of the Board of Directors of the Bank.

The loans which are the subject of this lawsuit, and which were not repaid in their entirety, were made over a period of time extending from July 6, 1965 to June 10, 1966. They were made to six different, but related, obligors—Albert Heisler, Mel Goldman, Ronald M. Brown, Automatic Accounting Corporation ("Automatic Accounting"), PMC America, Inc. ("PMC"), and Sports Packaging Corporation ("Sports Packaging"). The three named individuals each owned one-third of the shares of Automatic Accounting, which in turn owned 75% of the shares of PMC and 50% of the shares of Sports Packaging. The remaining unpaid loans to these ob-

ligors are as follows: Automatic Accounting, $21,808.39; PMC, $107,186.92; Sports Packaging, $77,854.54; Goldman, $14,370.22; Heisler, $13,005.41; Goldman, Brown and Heisler as a group, $15,262.50.

*Count 1*

The statutory violation alleged in count 1 is that set out in 12 U.S.C. § 84, which provides in relevant part:

"The total obligations to any national banking association of any person, copartnership, association, or corporation shall at no time exceed 10 per centum of the amount of the capital stock of such association actually paid in and unimpaired and 10 per centum of its unimpaired surplus fund. The term 'obligations' * * * shall include in the case of obligations of a copartnership or association the obligations of the several members thereof and shall include in the case of obligations of a corporation all obligations of all subsidiaries thereof in which such corporation owns or controls a majority interest."

Civil liability is imposed by 12 U.S.C. § 93:

"If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter * * * every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

The threshold question is thus whether the "total obligations" of any "person, copartnership, association, or corporation" exceeded the ten percent limitation. Because section 84 requires that the obligations of a corporate subsidiary be included with those of the parent if it "owns or controls a majority interest," it is clear that the obligations

of PMC at any one time must be included with those of Automatic Accounting, which owned 75% of PMC. It is plaintiff's further contention that the obligations of Sports Packaging and the three individuals must also be added to those of Automatic Accounting and PMC in determining whether the debt limit was exceeded.

Despite the fact that Automatic Accounting owned only 50% of Sports Packaging, evidence was offered to show that it controlled a majority interest. Thus it was established that Automatic Accounting, PMC and Sports Packaging all shared the same business address and that funds were occasionally transferred between Automatic Accounting and Sports Packaging. Brown testified that the "fiscal decisions" of Sports Packaging were made by Heisler, and that Phil Teitlebaum, who owned Voedisch Bros., Inc., which in turn owned the other 50% of Sports Packaging, handled the sales and manufacturing aspects of the business.

Contrary to this evidence of control by Automatic Accounting, however, is the fact that Teitlebaum, his wife, and one of his associates constituted three of the six directors of Sports Packaging. Moreover, Mel Goldman testified that all corporate functions other than administration were conducted by Teitlebaum and that Teitlebaum was "involved in" corporate decisions.

It is apparent to this court that plaintiff has failed to show that a majority interest of Sports Packaging was controlled by Automatic Accounting. No evidence supports the suggested conclusion that Teitlebaum was a mere nominee or puppet of Automatic Accounting, and indeed the evidence points to the contrary. The only reasonable conclusion that can be drawn is that Teitlebaum's power and authority within Sports Packaging were equal to that held by Automatic Accounting.

Entitled to some weight in this regard, although not binding upon the court, is the interpretation placed on this part of the statute by the Comptroller of the Currency. At the time of the loans here involved, the following interpretative regulation was in effect:

"2. Loans to one corporation, half (or less) owned by each of two parent corporations, are not combined with the obligations of either of the parents." (3 CCH Fed.Banking L.Reptr. ¶ 59,711, Comptroller's Manual for National Banks, ¶ 1310.)

The obligations of Sports Packaging must, therefore, be treated apart from those of Automatic Accounting and PMC.

■ With regard to the inclusion of the obligations of the three individuals who controlled Automatic Accounting, the statute says nothing about combining loans to the stockholders with those to the corporation. However, it is established in the case law that if a loan, made in the name of an employee or shareholder of the corporation, is treated in substance as a loan to the corporation then it may be combined with other loans to the corporation. See Atherton v. Anderson, 86 F.2d 518, 529 (6th Cir. 1936), rev'd on other grounds 302 U.S. 643, 58 S.Ct. 53, 82 L.Ed. 500 (1937); Hughes v. Reed, 46 F.2d 435, 442 (10th Cir.1931):

"The statute prohibits such loans to any person, and if an excess loan is in fact made to B, it does not avail that it is represented by notes signed by B's wife or his corporation. But the statute does not prohibit 10 per cent. loans to different persons or different corporations, if they be in fact separate loans, notwithstanding the borrowers may be related or affiliated. * * * But the proof that the loans are in fact excess loans to one borrower often must be found in circumstances, and latitude must be allowed in adducing such proof."

■ The only evidence offered in this regard was the testimony of Mel Goldman. When asked if the present unpaid obligations of himself, Heisler and Brown represented amounts borrowed

for personal or business use, he stated that they "were for use in the businesses." There is no evidence to show which businesses these loans were to be used for or whether the proceeds were in fact used for corporate purposes, as distinguished from the business purposes of the individuals. And the evidence showed that these individuals had affiliations with corporations other than the three here involved. Plaintiff has failed to show that these were only nominal obligations of the signatories, and therefore they cannot properly be combined with loans to the corporations.

■ During the period from July 6, 1965 to June 10, 1966, when the last extension of new money was made to this group of obligors, the Bank's 10 per cent limit ranged from $156,296.46 to $187,-763.26. Bank records show that the balance due on loans to all three individual debtors, either jointly or singly, never exceeded $65,000. Thus, no violation of section 84 occurred as to these obligations and plaintiff is entitled to no recovery in count 1 for damages suffered due to default thereon.

Bank records reveal that the combined obligations of Automatic Accounting and PMC first exceeded the 10% limit on December 16, 1965 and reached their peak on February 25, 1966. On the latter date the combined obligations were $219,733.77, exceeding by $41,662.66 the then existing 10% limit of $178,071.11.[1]

The Bank's outstanding loans to Sports Packaging first exceeded the legal limit on April 2, 1966 and reached their highest level on May 5, 1966. On that date Sports Packaging's loans totaled $206,807.44, $19,044.18 more than the allowable limit of $187,763.26.

With regard to the Automatic Accounting-PMC loans, there can be little doubt that defendant Keller was aware that they exceeded the 10 per cent limit. Pursuant to discussions between Keller

and the principals of Automatic Accounting, the Bank initially lent that corporation $30,000 on July 15, 1965. The proceeds were used as a down-payment on a purchase of Christmas books from Time-Life Books. On July 19, 1965, Keller issued a letter of credit in favor of Time-Life on Automatic Accounting's behalf. That letter of credit guaranteed payment of up to $285,425, an amount which, had it been demanded in full, would have created an obligation far in excess of the 10 per cent limit. In fact, the Bank lent only $78,759 pursuant to this letter of credit, but it did make additional loans to Automatic Accounting for the purchase of the Christmas books.

Shortly after the Time-Life letter of credit issued, Automatic Accounting presented Keller with a similar financing proposal regarding the purchase of cameras for resale. Keller authorized an extension of credit for this purpose and the first "camera loan" was made on October 2, 1965. In February, 1966 the principals of Automatic Accounting sought a further loan from the Bank through Leonard Brody, a loan officer. The obligations of that corporation had reached approximately $184,000, which exceeded the 10 per cent limit. Informed of this by Brody, and informed that no further loans could be made, the principals of Automatic Accounting stated that they would talk to Keller. Shortly thereafter Keller told Brody that all subsequent camera loans would be made to PMC, and that the existing camera loans should be transferred from Automatic Accounting to PMC. These directions were complied with.

Keller was hospitalized with a heart attack from October 3, 1965 to November 12, 1965 and did not return to the Bank until January of 1966. He was again hospitalized from February 11 to March 2, 1966, returning to the Bank on March 9, and was once again hospital-

---

1. If the $109,000 loan to PMC on May 26, 1966 were a new extension of credit the combined obligations on that date would exceed those of February 25.

However, the PMC liability ledger and plaintiff's summary exhibit (PX 188) disclose that this loan was merely a renewal of others of an equivalent amount.

ized from May 31 to June 25, 1966. Following each illness his attendance at the Bank was limited to short periods each day. He argues from these circumstances that he could not have been aware that the loans to Automatic Accounting-PMC exceeded the legal limit. However, the loans first exceeded the limit before he suffered these illnesses, and he was informed of the status of the loans by Brown, Goldman and Heisler at a meeting at his home in January, 1966 and by a written briefing on April 7, 1966. Moreover, he was actively involved in these obligors' affairs as late as May 13, 1966, when he issued a letter of credit on Automatic Accounting's behalf.

Keller also argues that the fact that the majority of the loans were formally approved by other Bank officers demonstrates that he was not aware of their existence. Testimony revealed, however, that formal approval by initialing the register slips was done in most instances only after the loan had been authorized by Keller. It was Keller with whom Brown, Goldman and Heisler dealt when they sought new extensions of credit.

■ From the foregoing evidence, the conclusion is inescapable that Keller knowingly permitted excess loans to PMC and Automatic Accounting.

With regard to the loans made for the purchase of cameras, Keller claims that a 25% limit is applicable pursuant to exception (6) of 12 U.S.C. § 84:

> "Obligations of any person, copartnership, association, or corporation, in the form of notes or drafts secured by shipping documents, warehouse receipts, or other such documents transferring or securing title covering readily marketable nonperishable staples when such property is fully covered by insurance, if it is customary to insure such staples, shall be subject under this section to a limitation of 15 per centum of such capital and surplus in addition to such 10 per centum of such capital and surplus when the market value of such staples securing such obligation is not at any time less than 115 per centum of the face amount of such obligation * * *."

■ In the first instance, I think that defendant has waived any reliance on this exception by failure to plead it in his answer, for it is "matter constituting an avoidance or affirmative defense" within the meaning of Rule 8(c), Fed.R.Civ.P.

■ Assuming that reliance on exception (6) has not been waived, that exception is inapplicable to the facts of this case. Although evidence showed that the first shipments of cameras were fully insured, as required by the exception, there was no evidence that the subsequent deliveries were insured. Moreover, electric movie cameras do not fall within the definition of "readily marketable nonperishable staples." The Comptroller's Manual for National Banks, ¶ 1550 (4 CCH Fed.Banking L.Rptr. ¶ 59,727) has interpreted this phrase to exclude most fabricated commodities:

> "Exception 6 is designed primarily to apply to such basic commodities as wheat and other grains, cotton, wool, basic metals such as tin, copper and lead, and the like. With few exceptions, fabricated commodities, unlike such uniform staples, do not constitute standardized interchangeable units regardless of the manufacturer and, accordingly, they do not possess the same broad marketability and do not qualify as readily marketable staples."

This interpretation of the breadth of the exception is consistent with the plain intention of its drafters. Defendant has not shown the interchangeability of these cameras, nor their ready marketability, and hence the exception is inapplicable.

Sports Packaging received its first loan from the Bank in October, 1965. Through additional loans, and renewals, the total obligations of this corporation reached a high of $206,807.44 on May 5, 1966. The evidence disclosed that the

proceeds were to be used to purchase fishing equipment manufactured in Hong Kong for packaging and resale in this country. Ronald Brown and Mel Goldman both testified that the loans to Sports Packaging were negotiated through Keller. Although Keller denied that he had initiated this line of credit, it is undisputed that he attended at least six Loan and Discount Committee meetings where Sports Packaging loans or renewals were approved.

Furthermore, a status report on the Sports Packaging debt structure was given to Keller by Brown, Goldman and Heisler at Keller's home in January, 1966. And by letter of April 7, 1966 Keller was informed of Sports Packaging's intentions regarding renewal and repayment of its various obligations. On this date the corporation's obligations to the Bank totaled more than $193,000, exceeding the legal limit by approximately $6,000. Keller testified that this report was submitted at his request because he wanted some of the loans to be paid up. It taxes credulity to urge that, despite this awareness of and concern with the debts of Sports Packaging, Keller was unaware then and at subsequent times that these loans were unlawfully excessive. I conclude that Keller knowingly assented to and acquiesced in the excessive loans to Sports Packaging.

■ Having concluded that the loans to Automatic Accounting-PMC, and the loans to Sports Packaging, constituted violations of section 84, this court must determine what damages the Bank has "sustained in consequence of such violation." 12 U.S.C. § 93. Plaintiff maintains that the total uncollected obligations of these corporations to the Bank, amounting to approximately $206,000, constitute the proper measure of recovery. Defendant contends, however, that only the excess over the 10 per cent limit may be recovered.

The standard to be followed is that set out in Corsicana Nat'l Bank v. Johnson, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919). In that case the Bank made one $15,000 loan to each of two co-venturers on the same day. Finding that these loans could properly be considered one loan of $30,000, which would exceed the Bank's $20,000 lending limit, the Court addressed itself to the damage issue (at 87–88, 40 S.Ct. at 90):

> "We assume that if, in good faith and in the ordinary course of business, defendant had made a loan of $20,000 to [the obligors], and if while this loan remained unpaid he had afterwards and as a separate transaction unlawfully loaned them an additional $10,000, in excess of the limit, the damage legally attributable to his violation of the limiting provision would have been but $10,000. But that is not this case. According to the evidence, the $30,000, less discount, was paid out by the bank as a single payment; and, if the jury found it to have been loaned in excess of the statutory limit * * * it must be upon the ground that it was a single transaction. That being so it would follow that the entire amount disbursed by the bank was disbursed in violation of the law. The cause of action against a director knowingly participating in or assenting to such excessive loan would be complete at that moment, and entire; there would be no legal presumption that the borrowers would have accepted a loan within the limit, if their application for the excessive loan had been refused; nor that a director who in fact violated his duty as defined by law would, if mindful of it, have loaned them even $20,000. * * * Hence the entire excessive loan would have to be regarded as the basis for computing the damages of the bank."

See also, Holman v. Cross, 75 F.2d 909, 912 (6th Cir.1935).

The evidence in this case disclosed that the legal limit was exceeded by a series of transactions, rather than by one as in the *Corsicana* case. And contrary to the facts of that case, no single

payout by plaintiff Bank exceeded the legal limit.[2] Because the violations of the Act did not occur until the individual loans which brought the total indebtedness over the limit were made, only funds then and thereafter paid out were lost "in consequence of such violation."

The obligations of Automatic Accounting and PMC first exceeded the limit when loans of $20,353.89 (loan no. 6294) and $10,164.31 (loan no. 6286) were made on December 16, 1965. The outstanding balance before these loans were made was $156,578.33; afterwards, it was $187,096.53, whereas the lending limit was then $167,584.20. The damages sustained as a result of this violation are therefore the difference between the greatest amount of the combined obligations of the corporations, $219,733.77 on February 25, 1966, and $156,578.33, or $63,155.44.

As to Sports Packaging, its obligations first exceeded the legal limit on April 2, 1966 when a loan of $23,727.92 (loan no. 7314) was made and loan no. 6339 was renewed and slightly increased by loan no. 7317. The total obligations before these transactions amounted to $170,171.38, while the largest total, reached on May 5, 1966, was $206,807.-44. The recoverable damages are therefore equal to the difference—$36,636.06.

 Judgment will accordingly be entered in favor of plaintiff and against defendant on count 1 in the amount of $99,791.50. Moreover, plaintiff is entitled to interest thereon from the date this action was filed. Gamble v. Brown, 29 F.2d 366, 381 (4th Cir.1928), cert den. 279 U.S. 839, 49 S.Ct. 253, 73 L.Ed. 986.

*Count 2*

The findings heretofore made demonstrate that defendant Keller was aware of the loans made to Brown, Goldman and Heisler, and to the three corporations in which they had an interest, and that he in fact initiated the lines of credit to all of them. Remaining for decision on count 2 are the questions whether his participation in these transactions constituted negligence or mismanagement of corporate affairs and, if so, whether it was the proximate cause of plaintiff's losses. The standard against which his actions must be tested was succinctly stated in Wallach v. Billings, 277 Ill. 218, 233–234, 115 N.E. 382, 388 (1917):

"Where the directors of a corporation are guilty of a breach or neglect of duty and the proximate result of such breach or neglect of duty is a loss to the bank there may be a recovery from such directors."

Plaintiff relies heavily on the fact that Keller failed to follow Bank regulations in certain of his dealings with this group of obligors. Thus it was established at trial, through the testimony of two Bank directors, a loan officer, and a cashier, that the initial letter of credit to Time-Life, in an amount in excess of $285,000, was issued by Keller without the required prior approval of the Loan and Discount Committee and without the knowledge of any other Bank director or officer. It was further established that some subsequent loans were authorized by Keller without first receiving the approval of the Loan and Discount Committee.

 But violation of a bank's internal rules and regulations with regard to lending procedure does not, without more, make a director and officer liable for the default of such loans. The common law imposes liability only for lack of diligence or negligence in the conduct of his official duties; it does not make him an insurer of the success of all ventures merely because corporate procedures are ignored. Hoehn v. Crews, 144 F.2d 665, 673 (10th Cir.1944), aff'd 324 U.S. 200, 65 S.Ct. 600, 89 L.Ed. 870; 3 Fletcher, Cyclopedia of Corporations §

2. Although the Time-Life letter of credit obligated the Bank in an amount in excess of the limit, the Bank was called upon to pay out less than the limit pursuant to this obligation.

1035 (1965 Rev.Vol.). Thus the issue is whether the authorization of the loans to these obligors constituted negligence in the performance of Keller's duties.

There was little evidence offered as to the soundness of the loans to these borrowers. The corporate obligors are no longer doing business and their assets, having been liquidated, are exhausted. But plaintiff adduced no evidence to show why the loans were defaulted or why the book, camera and fishing equipment ventures did not succeed.[3]

Approximately $165,000 of the $206,-000 in unpaid obligations of the corporations were secured by warehouse receipts or accounts receivable. Plaintiff offered no evidence to show the value of this collateral. Bank records offered by defendant demonstrate, however, that the value of the collateral for the initial secured loans to all three corporations exceeded the amount of the loans. Moreover, the corporations maintained deposit balances with the Bank at various times throughout this period, some of which were "frozen" by the Bank.

Of the approximately $43,000 in outstanding obligations of the individuals, none are secured but one is a joint obligation of all three and one is guaranteed by another of the individuals. No evidence was introduced to show that these loans were excessive in light of the net worth of these individuals, or that they were risky investments in other respects. And with regard to the corporations, although certain of the loans were excessive within the terms of the National Banking Act, no evidence of corporate capital structure was admitted which would permit an inference that the loans were fiscally unsound.

■ In the final analysis, plaintiff's evidence of negligence amounts only to the fact that a portion of the loans to these six obligors were not repaid. Plaintiff is, in effect, asking this court to apply the doctrine of *res ipsa loquitor*

and conclude, from the fact of default, that these loans were unsound from their inception and that their authorization was negligent. If this were the rule, however, bank directors would be required to respond in damages every time a loan proved uncollectable. And this is clearly not the law. See, *e. g.*, 3 Fletcher, Cyclopedia of Corporations, *supra*. Thus the only possible conclusion from the evidence in this case is that there is a failure of proof of negligence or mismanagement on defendant's part.

Plaintiff also offered evidence tending to show that Keller breached his fiduciary duty of loyalty and good faith to the Bank. He used an air travel credit card issued to Automatic Accounting to pay for a trip to Florida for himself and his son in December, 1965. And his wife used an Automatic Accounting credit card, signing her maiden name, to purchase gasoline in 1966 in an amount of $130, $100 of which was later paid back by Keller.

■ Certainly the receipt of these benefits from the Bank's borrowers constituted a breach of trust, and Keller would be liable to plaintiff for the value of the benefits received. See, *e. g.*, Fleishhacker v. Blum, 109 F.2d 543, 545–546 (9th Cir.1940), cert. den. 311 U.S. 665, 61 S.Ct. 23, 85 L.Ed. 427 (1940). But this breach of trust does not constitute evidence that the loans to Automatic Accounting were unsound when made, and it does not serve to impose absolute liability on Keller for the resulting losses.

■ It was also shown at trial that Keller had plans to leave the Bank and form a conglomerate corporation with Goldman, Heisler and Brown. This enterprise was to include the business ventures of these obligors as well is certain real estate ventures in which Keller had an interest. Had plaintiff proved a lack of reasonable care on Keller's part in extending loans to these obligors, this evi-

---

3. Indeed, the only evidence in this context showed that PMC lost a contract to sell cameras because its receipt of the cameras was delayed due to Vietnam war shipping priorities.

dence would tend to explain why he was willing to commit the Bank to such unreasonable risks. But it cannot substitute for evidence of negligence or intentional mismanagement, and it does not show that the granting of these loans was an unsound corporate decision in the first instance.

In summary, this court has concluded that plaintiff has failed to prove that defendant breached his duty of care and diligence in authorizing the uncollected loans to Automatic Accounting, PMC, Sports Packaging and Goldman, Heisler and Brown. Moreover, plaintiff has failed to prove that defendant's breaches of trust caused these losses to the Bank. Judgment will accordingly be entered in favor of defendant and against plaintiff on count 2.

*Conclusion*

For the reasons herein stated, judgment is entered in favor of plaintiff and against defendant on count 1 in the amount of $99,791.50 plus interest at the legal rate from July 10, 1968, and in favor of defendant and against plaintiff on count 2.