FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First National Bank in West Concord, Plaintiff,

v.

Garry R. GORDINIER; John Kwok–Chung Ma; Terry L. Myhre; Estate of Richard C. Newlin; and Kolleen K. Samek, as Personal Representative of the Estate of Richard C. Newlin; William Newlin; Joel F. Punke; and William E. Smock, Defendants.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First National Bank in West Concord, Plaintiff,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant.

Nos. 3–89 CIV 24, 3–89 CIV 712.

United States District Court, D. Minnesota, Third Division.

Jan. 10, 1992.

Dorsey & Whitney by Michael A. Lindsay, Minneapolis, Minn., for plaintiff.

Faegre & Benson by Norman R. Carpenter, and Mary Cullen Yeager, Minneapolis, Minn., for defendant St. Paul Fire and Marine Ins. Co.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, & ORDER FOR JUDGMENT

ALSOP, Chief Judge.

The above entitled actions came on for trial before the court on October 7–9, 1991. Based upon the evidence adduced at trial and upon all the files, records and proceedings herein, the court makes these findings of fact and conclusions of law.

## I. FINDINGS OF FACT

A. *The Bank and Its Directors and Officers*

1. The First National Bank in West Concord ("Bank") was a banking institution

organized and chartered under the laws of the United States of America, and it was insured by the Federal Deposit Insurance Corporation ("FDIC").

2. On or about March 5, 1987, the Office of the Comptroller of the Currency ("OCC") determined that the Bank was insolvent, ordered the Bank closed, took possession of its business and property, and appointed the FDIC receiver of the Bank. The FDIC undertook to administer the Bank's assets and affairs as receiver pursuant to the authority granted to it by 12 U.S.C. § 1821(d). The FDIC proceeded to liquidate the Bank. *See In re Receivership of First National Bank in West Concord,* No. 4–87 CIV 123 (D.Minn.). The court entered an order terminating the receivership on July 11, 1990.

3. Through October 10, 1984 William E. Smock ("Smock") was the Bank's principal officer. On October 1, 1984 Smock and the Bank's other shareholders sold the Bank to First West Concord Bancorporation, a one-bank holding company formed to acquire the Bank. Terry L. Myhre ("Myhre"), Richard C. Newlin ("Newlin"), William Newlin, Joel F. Punke ("Punke") and John Kwok–Chung Ma ("Ma") among them owned all of the stock of First West Concord Bancorporation.

4. As of October 10, 1984, the Bank's officers were Newlin, chairman; Punke, president; and Garry R. Gordinier ("Gordinier"), vice-president. Newlin and Punke were also directors of the Bank, along with Ma, Myhre, William Newlin, and Smock.

5. On August 8, 1985, Punke resigned as president of the Bank, and Gordinier became president. Gordinier was elected a director on October 10, 1985.

6. On October 31, 1984 and September 30, 1985, the Bank was examined by representatives of the OCC. The reports on these examinations were critical of certain aspects of the management of the Bank, and in late 1985 the Bank was asked to execute an administrative agreement requiring that certain practices cease and desist. Although terms and provisions of such an order were discussed with the Bank's management, no agreement was ever signed.

7. The OCC Report of Examination dated September 30, 1985 stated that the directors of the Bank could be held personally liable for losses on loans made in excess of the Bank's legal lending limit under 12 U.S.C. § 84 and 12 U.S.C. § 93.

8. Punke resigned from the Board of Directors of the Bank in July 1986, and Ma, Newlin, and William Newlin resigned in August 1986. In September 1986, Patrick C. O'Malley and Ronald Hanslow joined the Board.

### B. *Directors and Officers Liability Insurance*

9. On April 5, 1983, St. Paul Fire and Marine Insurance Company ("St. Paul") issued to the Bank its Directors and Officers Liability Policy No. 400 GM 8116 (the "D & O Policy"). The D & O Policy provided the following coverage:

> This Policy shall, subject to its terms, conditions and limitations, pay on behalf of ... The Insured ... because of any claim(s) made against them, jointly or severally, for "Loss" ... and caused by any negligent act, any error, any omission or any breach of duty while acting in their capacities as Directors or Officers or any matter claimed against them solely by reason of their being Directors or Officers.

10. On March 18, 1986, Gordinier as president and Newlin as chairman completed a St. Paul Financial Institutions Directors' and Officers' Liability Application ("Renewal Application") and submitted the completed form to St. Paul.

11. The answer to question 7 on the Renewal Application was that a director or officer of the Bank had been alerted to the following conditions:

a. Extensions of credit which exceed the legal lending limits;

b. Assets subject to classification as substandard, doubtful or loss, wherein the total of such assets exceed 25% of capital;

c. Significant violations of laws and regulations.

12. The Renewal Application also gave details on these conditions as follows: "Six credit overlines; 1 now paid out in full, 3 are farm credits that FHA guarantees fell through on, 2 other overlines are commercial loans." Although the "six credit overlines" were not otherwise identified in the Renewal Application, the court finds that the six credit overlines referred to in the Renewal Application were those extended to the Medical Institute/Daras; Leroy Paulson; Darrell Dohrman; James and Nancy Phelps; Martin and Ardis Dengler and Skyline Raceway, Inc.; and Tom and Neal Avery. The Avery and Dengler overlines were the commercial loans, and the Paulson, Phelps and Dohrman overlines were the farm credits. The Medical Institute/Daras overline is the overline that has been paid out in full, and it is not at issue in this action.

13. After reviewing the Renewal Application and interviewing Gordinier, St. Paul declined to issue a renewal or successor policy to the Bank.

14. St. Paul advised Gordinier as president of the Bank in a letter dated May 16, 1986 and received May 19, 1986 that its Policy of Directors and Officers Liability Insurance would terminate in thirty days, that is, on June 18, 1986.

15. The Bank chose not to extend coverage under the policy for a one-year period as provided in Endorsement No. 4 of the D & O Policy. Accordingly, the D & O Policy terminated on June 18, 1986.

16. St. Paul billed the Bank for the D & O Policy's premium for the period from April 6, 1986, the D & O Policy expiration date, through June 18, 1986, the Policy termination date. This bill was paid after the FDIC's appointment as receiver.

C. *Proceedings in Bankruptcy and Probate Courts*

17. Punke filed a petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Iowa in Sioux City on September 11, 1986. Punke scheduled the Bank as a creditor, on the basis of unpaid loans from the Bank. In his petition Punke did not identify the D & O Policy as providing indemnity for any potential claims. Discharge was entered on December 24, 1986. The order for discharge was subsequently clarified.

18. On September 19, 1988 the FDIC filed a Motion to Reopen and for Clarification in the Punke bankruptcy proceeding in the Northern District of Iowa. By this motion the FDIC sought to clarify the bankruptcy court's order of discharge of December 24, 1986 to permit the filing of an action against Punke by the FDIC in the United States District Court in Minnesota.

19. On October 31, 1988 an order was entered by the bankruptcy court allowing the FDIC to commence an action against Punke to establish his legal liability, and the dollar amount of such liability, in order to seek recovery under the Policy.

20. Ma filed a petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court in St. Paul on October 22, 1986 (Case No. 3–86–2387). Ma scheduled the Bank as a creditor, on the basis of unpaid loans from the Bank. In his petition Ma did not identify the D & O Policy as providing indemnity for any potential claims. Discharge was entered on April 26, 1988. The order for discharge was subsequently clarified.

21. On September 12, 1988 the FDIC filed a Motion for Clarification in the Ma bankruptcy proceeding in the District of Minnesota. By this motion the FDIC sought to clarify the bankruptcy court's order of discharge of April 26, 1988 to permit the filing of an action against Ma by the FDIC in the U.S. District Court in Minnesota.

22. On September 21, 1988 an order was entered by the bankruptcy court allowing the FDIC to commence an action against Ma to establish his legal liability in order to seek recovery under the Policy.

23. William Newlin filed a petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Iowa in

Des Moines on August 18, 1988 (Case No. 88–01772). William Newlin scheduled the Bank as a creditor, on the basis of unpaid loans from the Bank. In his petition William Newlin did not identify the D & O Policy as providing indemnity for any potential claims. Discharge was entered on November 29, 1988. The order for discharge was subsequently clarified.

24. On January 5, 1989 the FDIC filed a Motion for Clarification in the William D. Newlin bankruptcy proceeding in the Southern District of Iowa. By this motion the FDIC sought to clarify the bankruptcy court's order of discharge of November 29, 1988 to permit the filing of an action against William D. Newlin by the FDIC in the United States District Court in Minnesota.

25. On January 13, 1989 an order was entered by the bankruptcy court allowing the FDIC to commence an action against William Newlin to establish his legal liability in order to seek recovery under the Policy.

26. Richard C. Newlin died on October 13, 1986 in Des Moines, Iowa. A petition for administration of his estate was filed March 17, 1988 in Polk County, Iowa, Probate No. 54–25578. Kolleen K. Samek is the attorney and duly appointed and acting personal representative of the Richard C. Newlin Estate. No final order has been entered in these probate proceedings.

27. On September 9, 1988 the FDIC filed a Claim in Probate in the Estate of Richard C. Newlin in an amount in excess of $50,000 for officers' and directors' liability relating to Newlin's actions and omissions as an officer or director of the Bank. The claim was described as contingent upon a determination, in litigation or otherwise, of Newlin's liability to the FDIC as receiver of the Bank.

28. On March 29, 1989 Kolleen K. Samek as attorney and personal representative of the Richard C. Newlin Estate notified the FDIC that its claim was disallowed.

### D. *Proceedings in the D & O Action*

29. On January 11, 1989 the FDIC commenced an action in this court against Gordinier, Ma, Myhre, the Estate of Richard C. Newlin, Punke, and Smock in their capacities as officers and/or directors of the Bank, entitled *FDIC v. Garry Gordinier, et al.*, No. 3–89 CIV 24 (the "D & O Action"). Two days later, an amended complaint was filed adding William Newlin as a defendant. A Second Amended Complaint was filed pursuant to order dated April 11, 1990.

30. In its Second Amended Complaint, the FDIC sought to recover from the former directors and officers of the Bank for losses on certain loans, the extension, approval, or renewal of which constituted negligent acts, errors, omissions, or breaches of duties by the directors and officers. In its prayer for relief, the FDIC sought a money judgment jointly and severally against all defendants for losses suffered on each of some thirty-five loans and the cost and attorneys' fees incurred by the Bank or FDIC in collection efforts.

31. Count III of the FDIC's Second Amended Complaint in the D & O Action alleges that the directors negligently, carelessly, or imprudently extended or renewed credits to, among others, the following borrowers: Tom/Neal Avery, Martin and Ardis Dengler/Skyline Raceway, Inc.; Darrell Dohrman; James/Nancy Phelps; and Leroy Paulson. Count III included, among others, an allegation that the directors negligently permitted the loans in excess of the Bank's legal lending limit.

### E. *Judgments Entered in the D & O Action*

32. On June 20, 1990, default judgment was entered in the D & O Action against defendant William Newlin, on the FDIC's motion, in the amount of $1,487,311.91. On June 20, 1990, judgment was entered in the D & O Action against defendants Punke and Ma, on the FDIC's motion for summary judgment, in the amount of $1,487,-311.91. St. Paul was aware of the FDIC's motions before they were heard.

33. Defendant Estate of Richard C. Newlin failed to appear when this matter was called for trial on October 7, 1991. Accordingly, this court directed plaintiff to prepare an order for entry of judgment against the Estate of Richard Newlin. Judgment is now directed to be entered as of September 30, 1991 in the total amount (including prejudgment interest) of $2,216,-989.80.

### F. *The Settlement Agreement as to Defendants Gordinier, Myhre, and Smock*

#### 1. *Background*

34. On September 5, 1991, the FDIC and defendants Gordinier, Myhre, and Smock entered into a Settlement Agreement and Assignment of Claims ("Settlement Agreement"). The parties intended the agreement to operate pursuant to the principles enunciated in *Miller v. Shugart,* 316 N.W.2d 729 (Minn.1982).

35. The Settlement Agreement provided for payment by Gordinier, Myhre, and Smock personally of a settlement amount of $5,000.00. The Settlement Agreement also required the parties to execute a Stipulation and Confession of Judgment as to Defendants Garry Gordinier, Terry L. Myhre, and William Smock ("Stipulation"). The Stipulation in turn provided for a stipulated order entitled Findings of Fact and Conclusions of Law Regarding Defendants Garry Gordinier, Terry L. Myhre, and William Smock ("Findings"), to be signed by this court. The parties to the Stipulation, through their counsel and in open court, agreed that the dollar amount of the confessed judgment referenced in the Stipulation and the Findings should be amended consistent with the FDIC's proof at trial. The Findings provided for entry of judgment when "the coverage issues, if any, between the FDIC and St. Paul ... are resolved." The Findings further provided that the judgment may be satisfied only from the proceeds of the Bank's or defendants Gordinier's, Myhre's, and/or Smock's applicable insurance policies, and that the judgment shall not be satisfiable from nor may it be a lien upon any other assets of defendants Gordinier, Myhre, and/or Smock.

36. St. Paul received prior notice that the FDIC and defendants Gordinier, Myhre, and Smock were discussing or would discuss entering into such a stipulation. St. Paul received draft settlement documentation during the drafting of settlement materials.

37. On October 7, 1991 through October 9, 1991, with prior notice to St. Paul, this court reviewed the Stipulation and Confession of Judgment as to Defendants Gordinier, Myhre, and Smock and received evidence concerning the settlement's validity under *Miller v. Shugart.*

#### 2. *St. Paul's Denial of Coverage*

38. St. Paul was first advised of the commencement of the D & O Action on January 20, 1989 by defendant Smock. On receiving such notice, St. Paul denied any and all coverage. St. Paul was subsequently advised of the D & O Action by other directors, and St. Paul similarly denied any and all coverage. One of the bases of St. Paul's denial of coverage was that no notice of claims or occurrences giving rise to claims had been given during the policy period. St. Paul acknowledges that this purported defense, if valid, would apply to all of the Bank's directors.

39. Shortly after the D & O Action was commenced, St. Paul was also contacted directly by the FDIC. The FDIC requested that St. Paul attend a meeting to discuss settlement. St. Paul declined to attend this meeting and declined otherwise to discuss settlement.

40. Thereafter, on or about October 5, 1989, the FDIC commenced *FDIC v. St. Paul Fire and Marine Insurance Co.,* 783 F.Supp. 1176 (the "Coverage Action"), seeking declaratory judgment that the Policy provided coverage to the former directors and officers of the Bank for the losses alleged in the D & O Action.

41. On or about December 21, 1989, St. Paul filed its answer and denied coverage on various grounds. St. Paul admitted, on information and belief, that Smock served

as a director of the Bank until January 14, 1986. St. Paul has never amended or sought to amend its answer.

42. On February 1, 1991, the FDIC and St. Paul argued cross-motions for summary judgment. On February 20, 1991, this court granted the FDIC's motion in part and denied it in part and granted St. Paul's motion in part and denied it in part. The court found that the directors and officers gave adequate notice as to claims arising from the six credit overlines, but not as to the other claims.

43. On or about April 12, 1991, St. Paul served a further motion for amendment of the pretrial order and for summary judgment. In support of this motion, St. Paul sought to advance additional grounds for establishing that the Policy did not provide coverage. St. Paul had not advanced these grounds in its papers in support of its original motion for summary judgment or in opposition to the FDIC's motion for summary judgment. The time for bringing dispositive motions had previously been extended but had expired on February 1, 1991. On March 7, 1991, Magistrate Judge Franklin L. Noel had certified the case as ready for trial. Accordingly, on May 20, 1991, this court denied St. Paul's motion as untimely.

44. St. Paul continues to deny any and all coverage under the Policy. St. Paul continues to maintain that no notice of claim was given within the policy period, and St. Paul has not waived its right to appeal from this court's finding of coverage. In addition, St. Paul also continues to maintain, as to Gordinier, Myhre, and Smock, that recovery is barred because the Policy covers only negligent misconduct (not intentional misconduct) and that the loss resulted or may have resulted solely from intentional acts. St. Paul also continues to maintain, as to Gordinier, Myhre, and Smock, that the Policy does not cover losses resulting solely from violation of federal statute, and that the loss resulted or may have resulted solely from such violations. Accordingly, this court finds that St. Paul continues to deny coverage entirely.

45. The Settlement Agreement, by its terms, does not purport to bar St. Paul from raising any defenses as to coverage matters. Indeed, the Findings expressly preclude entry of judgment against defendants Gordinier, Myhre, and Smock "until the coverage issues ... are resolved," and provide that if there is a determination that no coverage exists, then no judgment shall be entered against those defendants.

### G. *Damages*

46. Both before and after the Bank closed, payments were made on various credits identified in the FDIC's Second Amended Complaint in the D & O Action. The total principal amount of losses on these credits is $1,706,655.73. Prejudgment interest on this amount (through September 30, 1991) is $510,334.07.

47. The above-mentioned losses include the losses the FDIC suffered on credits extended to the five credit overlines referenced in the Renewal Application. The total principal amount of these losses as of September 30, 1991 was $812,394.72. Prejudgment interest through September 30, 1991 was $217,049.97, for a total as of that date of $1,029,444.69.

48. Some of those credits extended to the five credit overlines before June 18, 1986 involved extension of "new money," that is, the provision to the borrowers of funds that they did not have before. Other credits involved renewal of previous credits but without extension of additional funds to the borrowers. Some credits involved a mixture of "new money" and "renewals."

49. Both before and after the Bank was closed, payments were made on some of the credits extended to these borrowers. The following findings are "net" of these payments.

50. In some instances, the Bank applied payments to the credits which were extended in violation of the Bank's lending limit, rather than to credits that did not constitute such violations. The FDIC's evidence reattributes payments, adopting a principle of applying payments first to the oldest credits extended to the borrower at issue,

then to the second credit, and so on. The following findings are based on these reapplications.

51. Prejudgment interest on these sums is calculated at the note rate until the Bank's closing, and thereafter (if lower than the note rate) at 8% per annum for 1987 and 1988 and at 7% per annum for 1989 and thereafter. The court finds these interest calculations reasonable and adopts them in the following findings.

52. The principal balances for the five credit overlines immediately before the first extension of credit to such borrower in excess of the Bank's legal lending limit were as follows:

| Borrower | Credit Balance |
|---|---|
| Avery | $126,358.41 |
| Dengler/Skyline | 109,608.78 |
| Dohrman | 127,615.44 |
| Paulson | 87,666.79 |
| Phelps | 131,533.21 |
| Total | $582,782.63 |

53. The highest credit balance of each of the five credit overlines between the date of the first extension of credit in excess of the Bank's lending limit and June 18, 1986, and the difference between that credit balance and the corresponding credit balance set forth in the above Findings of Fact, ¶ 52, are set forth below. The interest accrued on such difference as of September 30, 1991 also is set forth:

| Borrower | Credit Balance | Difference | Interest |
|---|---|---|---|
| Avery | $ 212,893.28 | $ 86,534.87 | $ 39,350.34 |
| Dengler/Skyline | 242,652.19 | 133,043.41 | 76,047.58 |
| Dohrman | 161,852.58 | 34,237.14 | 10,218.38 |
| Paulson | 260,000.00 | 172,333.21 | 92,191.19 |
| Phelps | 146,476.18 | 14,942.97 | 8,815.91 |
| Total | $1,023,874.23 | $441,091.60 | $226,623.40 |

After September 30, 1991, prejudgment interest accrues at the daily rate of $83.89.

## II. CONCLUSIONS OF LAW

### A. *Introduction*

1. St. Paul's position regarding the settlement prior to and during trial made the issues before the court less than clear. St. Paul insisted that the FDIC's settlement with the former directors and officers prejudiced St. Paul's efforts at trial and that the court was precluding St. Paul from litigating issues St. Paul believed should be before the court, namely, whether the former directors and officers were actually liable to FDIC.

2. To the contrary, the court noted in its preliminary hearing for this action that plaintiff's burden would be to establish the validity of the settlement under *Miller v. Shugart,* to demonstrate its amount of loss, and to show the existence of the D & O Policy. The court agreed that the settlement could not have any effect on the scope of *coverage* under the D & O Policy and directed St. Paul that it carried the burden to demonstrate that coverage for the claims at issue did not exist. As discussed *infra,* however, the issue of whether the insured had any *liability* to FDIC is encompassed by a finding that a settlement meets the requirements under *Miller v. Shugart* and its progeny.

3. St. Paul's positions regarding the settlement and the declaratory judgment action are as follows. First, St. Paul argues that the settlement the FDIC and the former directors and officers entered into prior to trial is unenforceable against St. Paul because it violates the insured's contractual obligations to cooperate with its insurer and to not settle without the insurer's consent. In essence, St. Paul contends that the settlement does not meet the requirements for a *Miller–Shugart* settlement, one of which requires the insured not to violate its duty to cooperate with the insurer.

4. Second, St. Paul contends that, regardless of the effect of the settlement, no

coverage exists under the D & O Policy for the claims arising from the six credit over-lines because they involve "intentional" and "illegal" acts by the directors and officers, which are not covered "losses" under the policy, and because insuring losses brought about by "illegal" acts is against public policy.

5. Whether the settlement is valid under *Miller v. Shugart* and thus enforceable as against St. Paul and whether the policy affords coverage for the alleged lending limit violations are separate issues and will be treated separately.

### B. *Validity of Settlement Agreement under Miller v. Shugart*
#### 1. *General Considerations*

■ 6. Settlements between an insured and an injured party without the involvement of the insurer are binding on an insurer only in limited situations. A party seeking to bind the insurer to such a settlement must show (1) the insured did not violate its contractual duty to cooperate with the insurer; (2) the settlement is not the product of fraud or collusion; and (3) the settlement is reasonable and prudent. *Miller v. Shugart*, 316 N.W.2d 729, 732–33 (Minn.1982).

#### 2. *St. Paul's Objections to the Settlement*

■ 7. St. Paul first apparently argues that because it began to indemnify some of the former directors and officers for their defense costs after this court issued its February 21, 1991 order, it somehow had acceded that coverage existed. As far as the court can discern, St. Paul contends that the subsequent unilateral settlement of Gordinier, Myhre, and Smock voids the policy coverage as a breach of the insurer's duty of cooperation, relying on cases in line with *Buysse v. Baumann–Furrie & Co.,* 448 N.W.2d 865 (Minn.1989) and *Sargent v. Johnson,* 551 F.2d 221 (8th Cir.1977).

8. Cases prior to and subsequent to *Miller v. Shugart* have held that an insured's settlement with an injured party is not a valid *Miller–Shugart* agreement unless the insurer denies *all* coverage: "Only the in-surer's denial of the existence of *any* coverage for the claim and the resultant exposure of the insured to liability for the entire amount of any damage award provide a basis for requiring the insurer's right to the insured's cooperation to yield to the insured's need to extricate himself or her-self without the insurer's agreement." *Buysse v. Baumann–Furrie & Co.,* 448 N.W.2d 865, 872 (Minn.1989) (citing to *Miller,* 316 N.W.2d at 734–35; *Clemens v. Wilcox,* 392 N.W.2d 863, 867 (Minn.1986)); *Steen v. Underwriters at Lloyds London,* 442 N.W.2d 158, 162 (Minn.App.1989); *see also Sargent v. Johnson,* 551 F.2d 221, 231 (8th Cir.1977).

9. The insurer in *Buysse,* for instance, acknowledged that the claims of negligent performance of accounting services were within the policy coverage of the insured, but the insurer contended the policy limit for the particular claims was $500,000, not the $1 million the insured alleged. *Buysse,* 448 N.W.2d at 866–67. The insured eventually settled with the injured parties without the insurer's approval. *Id.* at 867. The court refused to enforce the settlement against the insurer, finding that "when an insurer has acknowledged the existence and applicability of coverage with respect to a pending action, the deprivation of the [insurer's] contractual right to defend and settle the lawsuit . . . prejudices the insurer and voids the policy coverage." *Id.* at 874.

10. The court finds, however, that St. Paul's position in the present action differs significantly from the insurers' in cases such as *Sargent v. Johnson* and *Buysse* where the insurer admitted to some coverage, but denied coverage to the extent the insurer claimed. In the present action, St. Paul originally denied any and all coverage and never retracted this position. Although St. Paul began to indemnify the former directors and officers for their legal costs in the D & O Action, it still denied that any and all coverage existed for the claims remaining against them after the February 21, 1991 order. The court finds St. Paul's opposition to the settlement in this respect without merit.

■ 11. St. Paul next argues that if liability and coverage both depend on the same factual determination, an insured may not admit to liability without the insurer's approval and thereby prevent the insurer from contesting this factual determination for the purposes of coverage. *Economy Fire & Cas. Co. v. Iverson*, 445 N.W.2d 824, 829 (Minn.1989) (Simonett, J., dissenting). St. Paul contends that the former directors and officers' liability depends on a finding of negligence, and that, likewise, coverage for their acts depends on whether they acted negligently or intentionally.

12. The facts of *Economy Fire* illustrate the potential harsh effect on an insurer if an insured is permitted to admit to liability in such circumstances. The injured party in *Economy Fire* had been shot by the insured at the insured's home and brought claims of negligence, intentional assault (battery) and loss of consortium. The insurer afforded a defense for the claims but reserved its rights to deny coverage under the intentional act exclusion of the policy if the insured's conduct was found intentional. *Id.* at 828. The insured eventually settled with the injured party without the approval of the insurer, admitting to negligence only. *Id.* at 826.

13. The insurer brought a declaratory judgment action, seeking a declaration that the acts were intentional and that no coverage existed for the settlement judgment. *Id.* The jury found that the insured had acted in self-defense and that no liability existed between the injured party and the insured. The majority opinion found that this determination collaterally estopped the injured party from enforcing its settlement against the insurer. *Id.* at 827.

14. In dissent, Justice Simonett concluded that the settlement was unenforceable not only because of the jury's finding of self-defense in the declaratory judgment action, but also because the settlement as a matter of law did not meet the requirements of *Miller v. Shugart*. *Id.* at 829.

Justice Simonett pointed out that in *Miller v. Shugart* the insurer had denied all coverage, "and its denial was based not on whether the defendant driver was negligent, but on an entirely different factual issue, namely, whether the defendant driver was an agent of the owner, and therefore an insured under the policy." *Id.* at 830. In contrast, the same factual determination the insured admitted to in its settlement in *Economy Fire* controlled the coverage issue: whether the insured's conduct was negligent or intentional. *Id.* at 829. Justice Simonett reasoned that if the insured "deprives [the] insurer of its right to have that factual determination made, the insured violate[s] the cooperation clause of [the] policy." *Id.* St. Paul asserts that Justice Simonett's opinion in *Economy Fire* dictates a similar result in the present case.

15. The court finds St. Paul's reliance on *Economy Fire* meritless. First, this court has considerable doubt as to the strength of the dissent as controlling law. Even if Justice Simonett's opinion is controlling, however, unlike the situation in *Economy Fire*, coverage and liability in the present action do not depend on the same factual determination.

16. The court finds this case more closely resembles *Hennings v. State Farm Fire & Cas. Co.*, 438 N.W.2d 680 (Minn.App. 1989). In *Hennings*, the insured faced liability from a boating accident. The insurer denied coverage on the grounds that the business and watercrafts exclusions of the policy applied. The insured eventually entered into a settlement with the injured party, which Justice Simonett even deemed a "proper" *Miller–Shugart* agreement. *Economy Fire*, 445 N.W.2d at 829 n. 2.

17. Like the insurer in *Hennings*, St. Paul contests coverage on grounds separate from those necessary for proof that the former directors and officers are liable to the FDIC. First, St. Paul contends that notice of the five credit overlines was inadequate to extend coverage to these claims.[1]

---

1. St. Paul certainly cannot now argue that it no longer denies coverage on the basis of notice. St. Paul attempted to raise the notice issue again at trial and submitted unsolicited post-trial memorandum arguing the inadequacy of notice under the policy, even though these issues had

Second, St. Paul contends that the policy does not cover statutory violations or intentional actions, only negligent actions.

18. Although St. Paul's argument as to the intentional or Illegal action exclusions first appears plausible, as discussed *infra*, further analysis of the policy reveals that it does not contain an exclusion for intentional or "illegal" acts by the directors and officers. Whether the former directors and officers acted intentionally or negligently or whether their acts constituted a statutory violation under 12 U.S.C. §§ 84, 93 has no effect on the coverage issue. Accordingly, when the insureds admitted to negligence in their settlement agreement, they did not preclude St. Paul from contesting those factual determinations governing coverage because they rest on separate grounds.

19. One final issue requires clarification at this point. St. Paul vehemently contends that the FDIC must prove that the directors and officers were legally liable to the FDIC before the settlement agreement is binding on St. Paul. This position, however, if true, would completely undercut the purpose and effect of a *Miller–Shugart* agreement.

20. The insurer, of course, is in an unenviable position: "on the one hand it can stand back and risk a large settlement, or on the other, it can enter settlement negotiations, take the defense of the insured and risk waiving possible coverage defenses." *St. Michel v. Burns & Wilcox, Ltd.*, 433 N.W.2d 130, 134 (Minn.App.1988).

21. The purpose of a *Miller–Shugart* settlement, however, is to permit an "abandoned insured to protect itself from personal liability by settling with the plaintiff." *Id.* (citing to *Arizona Property & Casualty Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 735 P.2d 451, 459–460 (1987)). As a consequence, "[t]he insurer takes the risk it erred in denying coverage." *Id.* (citing to *State Farm Mut. Auto. Ins. v. Paynter*, 122 Ariz. 198, 593 P.2d 948, 950–51 (Ct.App. 1979)).

22. Clearly, if the insured settles with the injured party, "*Miller* does not permit a separate action [to dispute liability] after a settlement has occurred. The insurer is bound to the settlement if the three tests of *Miller* are satisfied." *S.G. v. St. Paul Fire & Marine Ins. Co.*, 460 N.W.2d 639, 645 n. 3 (Minn.App.1990) (citing to *St. Michel*, 433 N.W.2d at 134). Thus, the remaining question regarding the settlement is whether it satisfies the three requirements of *Miller v. Shugart.*

### 3. Reasonableness of Settlement Agreement

23. During the trial of this matter, the FDIC presented the testimony of Dr. Robert Cramer concerning standards of care ordinarily expected of bank directors in this area. Based on this evidence, a fact-finder could reasonably have concluded that defendants Gordinier, Myhre, and Smock had been negligent with respect to the "six credit overlines."

24. Faced with St. Paul's denial of coverage, defendants Gordinier, Myhre, and Smock were potentially exposed to personal liabilities in excess of the Policy limits of $1 million. The exposure on the "six credit overlines" alone exceeded the Policy limits.

25. The Settlement Agreement required payment of a settlement amount of $5000.00. This court finds that this settlement amount was as much as the defendants could reasonably be expected to pay.

26. The court finds that the settlement agreement was reasonable in all other respects.

### 4. Absence of Collusion

27. The amount of the stipulated judgment was reasonable in light of the evidence introduced by the FDIC, and the conduct upon which the settlement was predicated actually occurred. St. Paul was kept informed before and throughout the settlement negotiations and the finalization of the settlement documentation. The court finds no evidence that the agreement was obtained through fraud or collusion.

been resolved by this court's prior February 21, 1991 order on cross-motions for summary judg-

ment.

### 5. *Lack of Breach of Insurer's Duty of Cooperation*

28. The court finds that the insureds were faced with a complete denial of coverage by their insurer, the admissions they made in the settlement as to liability in no way prejudiced St. Paul's ability to contest coverage, and the insureds in no way breached their duty of cooperation or any other duties within the policy.

### 6. *Conclusion*

29. The court finds that the Settlement Agreement between the FDIC and Gordinier, Myhre, and Smock meets the requirements under *Miller–Shugart* and is valid, binding, and enforceable against St. Paul.

### C. *St. Paul's Claims that Coverage is Barred*

30. A finding that a settlement is valid under *Miller–Shugart* does not resolve any of the coverage issues the insurer might raise. The author of *Miller v. Shugart* recently underscored this important point: "If the insurer's denial of coverage is sustained, i.e., if there is found to be no coverage for the *Miller–Shugart* judgment, that ends the matter; there is no recovery against the insurer and the reasonableness of the settlement becomes a moot issue." *Alton M. Johnson Co. v. M.A.I. Co.,* 463 N.W.2d 277, 279 (Minn.1990) (Simonett, J.); *see also Buysse v. Baumann–Furrie & Co.,* 448 N.W.2d 865, 872 (Minn.1989) ("Included in 'the facts' to which the decision in *Miller v. Shugart* is limited, is the fact that the stipulation for settlement of the main action did not purport to control the question of coverage, which was the subject of an independent action....").

31. In evaluating insurance coverage and exclusions within a policy, an insurer denying coverage because of a policy exclusion bears the burden of proof and insurance exclusion clauses are to be strictly interpreted against the insurer. *Hennings v. State Farm Fire and Casualty Co.,* 438 N.W.2d 680, 683 (Minn.App.1989); *Reinsurance Ass'n of Minnesota v. Patch,* 383 N.W.2d 708, 711 (Minn.Ct.App.1986).

32. With respect to St. Paul's defense that coverage is barred because the losses flowed from conduct that is actionable solely because (a) it is intentional misconduct, or (b) constitutes a statutory violation, the court concludes as follows:

a. The Policy extends to losses caused by deliberate, intentional, or knowing acts, unless otherwise specifically excluded by the Policy. No such exclusions apply in this matter.

b. The losses claimed by the FDIC in connection with credits extended in violation of the Bank's lending limit flow from conduct that is actionable as negligence, whether or not they also flow from conduct actionable under 12 U.S.C. § 84 and 12 U.S.C. §. 93. St. Paul's defenses—that the Policy bars recovery where "liability arises *solely* from intentional actions" or "*solely* from violations of federal law"—do not apply.

c. The Policy extends to losses incurred from extensions of credit in excess of the Bank's lending limit, whether as common-law negligence, as a negligent violation of 12 U.S.C. § 84, or as a knowing violation of 12 U.S.C. § 84 and 12 U.S.C. § 93. Indemnity is afforded the directors and officers for losses based upon violations of law unless specifically excluded by the Policy and unless there is a specific adjudication of a violation of federal law. No such exclusions apply, and no such adjudication has been made.

33. With respect to St. Paul's defense as to defendants Ma, William Newlin, and Punke that coverage is barred by the bankruptcy discharges for those defendants, the court concludes as follows:

a. The FDIC's actions with respect to the bankruptcy proceedings of Ma, Punke, and William Newlin were timely and sufficient for purposes of this action. Coverage is not barred by reason of the date of such actions.

b. The claims by the FDIC against directors Ma, Punke, and William Newlin were not discharged in bankruptcy. The terms of such discharges (as sub-

sequently modified or clarified) permitting the FDIC to proceed in this matter are fully valid and enforceable.

c. Any failure of Ma, Punke and/or William Newlin to give notice of the FDIC's post-discharge motions in the bankruptcy proceedings (1) was not a breach of the Policy's cooperation clause, (2) was not a material breach, and (3) did not prejudice St. Paul.

34. St. Paul's defense that credits involved dishonesty, personal profit to the directors, or self dealing do not apply to any of the losses as to which notice of claim was given.

35. Finally, this court concludes that Smock was a regular director of the Bank (and not merely an honorary director) through and including January 14, 1986.

### D. *Damages*

36. The Renewal Application provided notice as to all losses resulting from credits extended to the borrowers identified as the "six credit overlines" on or before the date of the Policy's expiration, that is, June 18, 1986.

37. The FDIC is therefore entitled to damages resulting from the extensions of credit to the five of the "six overline" borrowers still at issue, that is Tom/Neal Avery; Martin and Ardis Dengler and Skyline Raceway, Inc.; Darrell Dohrman; Leroy Paulson; and James/Nancy Phelps.

38. The interest rates used by the FDIC in its damage calculations are reasonable.

39. The FDIC's reapplication of payments received before the Bank was closed is reasonable. *Del Junco v. Conover*, 682 F.2d 1338, 1343 (9th Cir.1982).

40. The court finds the standard applied in *First Nat'l Bank of Lincolnwood v. Keller*, 318 F.Supp. 339 (N.D.Ill.1970) instructive in determining the proper measure of damages with regard to the five credit overlines.

41. If a single loan itself constitutes a lending limit violation, the entire loan would constitute damages. *Keller*, 318 F.Supp. at 346 (relying on *Corsicana*

*Nat'l Bank v. Johnson*, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919)).

42. Where the initial loan or loans were under the lending limit, however, the proper measure of damages is derived by determining the difference between the credit balances of each such borrower immediately before the first extension of credit in excess of the bank's lending limit, and the highest credit balance thereafter on or before the date of the D & O Policy's expiration. *See Keller*, 318 F.Supp. at 346–47 ("Because the violations of the Act did not occur until the individual loans which brought the total indebtedness over the limit were made, only funds then and thereafter paid out were lost 'in consequence of such violation.' ").

43. The court concludes that renewals of loans that were originally under the lending limit violation are not to be considered losses as a consequence of the lending limit violation. Although the *Keller* decision is somewhat ambiguous on this point, *cf. Keller*, 318 F.Supp. at 344 n. 1, 347, the court finds that only new money may be included as losses recoverable for the lending limit violation. As such, the calculation of losses as set forth in the above Findings of Fact, ¶ 53, do not include losses for renewals, even if made after the date of the first extension of credit in excess of the bank's lending limit.

44. As in *Keller*, none of the lending limit violations in the present action occurred as a result of one transaction; in other words, none of the five credit overlines resulted from a single loan constituting a violation. Rather, a series of loans were extended to the borrowers which eventually reached an amount in violation of the lending limits set out in the National Bank Act, 12 U.S.C. § 84.

45. Therefore, the court finds the damages flowing from the claims for which the Renewal Application constituted notice include the difference between the credit balances of each such borrower immediately before the first extension of credit in excess of the Bank's lending limit, and the highest credit balance thereafter on or before the date of the Policy's expiration

(June 18, 1986), that is, the principal amount of $441,091.60 interest through September 30, 1991 of $226,623.40, and daily interest thereafter of $83.89.

## III. ORDER FOR JUDGMENT

Accordingly, based upon the files, records and proceedings herein, the evidence adduced at trial,

IT IS HEREBY ORDERED That the Clerk of Court shall enter judgment as follows:

IT IS ORDERED, ADJUDGED AND DECREED That plaintiff Federal Deposit Insurance Corporation is entitled to a declaration of coverage for the five credit overlines identified in this court's order in this action on February 21, 1991 and to a judgment against defendant St. Paul Fire & Marine Insurance Company for money damages in the amount of $676,-271.78, including principal and interest to the date of these Findings of Fact and Conclusions of Law.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED That plaintiff Federal Deposit Insurance Corporation is entitled to judgment against defendant Richard C. Newlin for money damages in the amount of $2,216,989.80 to be entered as of September 30, 1991.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED That plaintiff Federal Deposit Insurance Corporation is entitled to entry of judgment against defendants Garry L. Gordinier, Terry L. Myhre, and William E. Smock in the amounts of $2,216,989.80, such judgment to be entered as of September 30, 1991, and to be subject to the conditions set forth in the stipulated Findings of Fact and Conclusions of Law Regarding Defendants Garry Gordinier, Terry L. Myhre, and William Smock.